Eli BALLAN, et al., Plaintiffs,

v.

The UPJOHN COMPANY, et al., Defendants.

No. 5:92–CV–9.

United States District Court, W.D. Michigan, Southern Division.

Dec. 29, 1994.

Jill S. Abrams, Stephen J. Fearson, Jr., Abbey & Ellis, New York City, for dismissed plaintiffs Diane and Jonathan Abbey.

Dianne M. Nast, Steven M. Steingard, Kohn, Nast & Graf, P.C., Philadelphia, PA, for dismissed plaintiff Paul Longo.

Stuart D. Wechsler, Andrew D. Friedman, Wechsler, Skirnick, Harwood, Halebian & Feffer, New York City, for dismissed plaintiff Victoria Shaev.

Curtis V. Trinko, Curtis V. Trinko Law Offices, and Robert M. Kornreich, Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiff Thomas E. Acito.

Joseph H. Weiss, Law Offices of Joseph H. Weiss, New York City, for dismissed plaintiff Ellen Klein.

William S. Farr, Farr & Oosterhouse, Grand Rapids, MI, for plaintiffs.

Elwood S. Simon, Elwood S. Simon & Associates, Bloomfield Hills, MI, and Stanley D. Bernstein, Kreindler & Kreindler, New York City, and Karen L. Morris, Morris & Morris, Wilmington, DE, for plaintiff Thomas Acito.

Jasper A. Cragwall, Jr., William K. Holmes, Devin Sean Schindler, Warner, Norcross & Judd, Grand Rapids, MI, William R. Norfolk, Elizabeth A. O'Connor, James H. Carter, Jr., Sullivan & Cromwell, New York City, for defendants.

### OPINION RE MOTION FOR CERTIFICATION OF CLASS

HILLMAN, Senior District Judge.

Before the court in this securities fraud case is plaintiff Thomas Acito's motion for class certification. Plaintiff, a purchaser of defendant The Upjohn Company's stock, alleges defendants: (1) violated Section 10(b) of the Securities and Exchange Act, and Rule 10b–5 promulgated thereunder; (2) violated Section 20 of the Securities and Exchange

Act; and (3) committed common law fraud and deceit. Defendants are The Upjohn Company ("Upjohn"), a pharmaceutical corporation headquartered in Kalamazoo, Michigan, as well as eight individuals who are Upjohn's corporate directors and officers. Defendants oppose class certification, claiming plaintiff's case does not meet the requirements of Fed.R.Civ.P. 23. For the reasons stated below, plaintiff's motion is DENIED.

## FACTS

Defendant Upjohn is the developer and manufacturer of the drug Halcion, a widely prescribed sleep medication. Technically known as triazolam, Halcion is a benzodiazepine compound which is unique because of its short half-life. Upjohn claims Halcion takes effect quickly, and then is metabolized quickly. Further, according to defendant, it helps the patient go to sleep, but does not leave the patient feeling drowsy the next morning. In practice, Halcion has been controversial because of the side effects it can produce. One court noted that "[a]ccording to defendant Upjohn, the reported injuries have included amnesia ... vertigo ... hangover ... nervousness, insomnia, drowsiness ... attempted suicide ... hallucinations ... aggression, euphoria, headache ... and others." *Pasternak v. Upjohn Co.*, 92 CV 5987, unpub. op. at 2 (E.D.N.Y. September 19, 1994).

The primary factual issue in this case, however, is not whether Halcion users suffer side effects. The issue is whether defendants committed fraud on the stock market by allegedly concealing research data concerning Halcion's side effects so as to inflate artificially the price of Upjohn's stock.

After Halcion was first synthesized in 1969, it was subjected to numerous studies to determine its safety and effectiveness. Plaintiff claims that defendants deliberately manipulated test data in several of these studies to make Halcion appear safer and more effective than it actually is. Plaintiff asserts that defendants began this fraudulent practice in one of the very first clinical studies of Halcion, conducted in Michigan in 1972. Plaintiff states that in this study, known as Protocol 321, defendants intentionally underreported the number of side effects suffered by study participants. Plaintiff states that in a second study, Protocol 6045, more than half of the study's participants were enrolled by a doctor who was found by a Food and Drug Administration ("FDA") investigation to have fabricated patient records and also to have failed to report adverse reactions. Pointing to a third study, Protocol 6415, plaintiff also accuses defendants of relying on test data falsified by the doctor who conducted the tests. Plaintiff states that in a fourth study, Protocol 9118, results from 188 out of 1,567 subjects were omitted without explanation.

Plaintiff contends that Upjohn, based on its fraudulent testing practices, obtained approval in 1977 to market the drug in Belgium and the Netherlands at doses of up to 1 milligram. In 1979, however, the Netherlands banned the drug after having received approximately 1,100 reports from doctors citing serious side effects in patients who took Halcion.

In 1982, Halcion was licensed for sale in the United States for doses of up to 0.5 milligrams. Plaintiff states this approval was based in part on the inaccurate protocols noted above. In 1987, however, the license previously granted for the 0.5 milligram dose was suspended by France and Italy. Upjohn then lowered the recommended starting dose in the United States to 0.25 milligrams.

In addition to deceiving governmental drug regulators, plaintiff claims defendants also failed to disclose Halcion's known adverse side effects to Upjohn's stockholders. Plaintiff states defendants failed to disclose the truth about Halcion in Upjohn's Annual Report to Shareholders for the fiscal year ending December 31, 1987, and in Upjohn's Annual Report filed in March 1989 on Form 10-K for the year of 1988. Further, plaintiff claims defendants issued reports throughout the class period on Form 10-K and quarterly reports on Form 10-Q that were false and misleading.

Plaintiff alleges that defendants' fraudulent testing practices were discovered as the result of a product liability action in Utah. The action was settled prior to trial. As part of the settlement, all documents produced in the case were to remain confidential. Plain-

tiff states that nevertheless some of the documents produced were provided to the Committee on Safety of Medicines ("CSM") in the United Kingdom ("UK"). On August 25, 1991, *The Sunday Express*, a British newspaper, reported that a spokesman for Upjohn's British subsidiary, Upjohn UK, had admitted errors in a 1972 study conducted in Michigan. On August 28, 1991, *The Washington Post* reported that a spokesman for Upjohn had confirmed the presence of errors in the study. After undertaking a review of Halcion's safety, the CSM announced by letter dated September 30, 1991, that Halcion sales would be suspended as of October 2, 1991. Plaintiff further alleges that subsequent to the UK suspension, sales of Halcion were banned in Finland, Norway, Argentina, Jamaica, and the Netherlands.

On January 20, 1992, *The New York Times* ran a front page story entitled, "Maker of Sleeping Pill Hid Data On Side Effects, Researchers Say." The article summarized many of the above claims. It also included portions of an interview with Dr. Ian Oswald, a Scottish psychiatrist, whom plaintiffs in the Utah product liability case had planned to call as an expert witness. In addition, it noted that in August of 1991, the FDA had begun an investigation of Upjohn's clinical trials of Halcion.

On January 21, 1992, in response to the January 20, 1992, article in *The New York Times*, plaintiff, along with eleven others, filed this action. For various reasons that will be discussed below, only plaintiff Thomas Acito now remains. He is represented by eight law firms.

Plaintiff initially proposed a class period restricted only by the relevant statute of limitations, beginning January 21, 1989, and ending January 20, 1992 ("original class period"). However, in his reply brief to defendant's brief opposing class certification, as well as at oral argument, plaintiff proposed shortening the class period by approximately four months. Plaintiff now suggests that the class period should run from January 21, 1989, through October 1, 1991 ("revised class period"). Plaintiff states that he chose the earlier date to end the class period because it will eliminate certain class conflicts and make

the case more manageable. Because plaintiff's suggestion was not made in the form of a motion to amend the complaint, the class period under which plaintiff intends to proceed remains unclear to the court.

Plaintiff alleges defendants made various misrepresentations and omissions during the class period which fraudulently inflated the market price of Upjohn's stock. Plaintiff notes that during the original class period, the stock's price fell from approximately $49 per share to approximately $40 per share. While plaintiff did not provide information concerning share prices for the revised class period, according to defendants, Upjohn closed at $44½ per share on October 1, 1991. Defendants also state that Upjohn stock remained around $43 per share for the next few weeks thereafter.

Relying on the "fraud on the market theory" adopted by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), plaintiff seeks damages for class members. Plaintiff also seeks reasonable attorneys' fees, as well as costs and expenses.

The defendants have denied all plaintiff's securities claims as well as the common law claims of fraud and deceit.

## CLASS CERTIFICATION

For a court to certify a class, the proposed class must first meet the prerequisites of Fed.R.Civ.P. 23(a). While evaluating whether the proposed class meets these prerequisites, the court should not engage in a detailed evaluation of the merits of a plaintiff's case. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). However, the burden of showing that the case is deserving of class action treatment falls on the party requesting class action. *Senter v. General Motors Corp.*, 532 F.2d 511, 520 (6th Cir.1976), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976). A court's decision to certify a class must be based on a "rigorous analysis" of the particular facts of the case, *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982).

In evaluating the prerequisites of class certification, I recognize that varied and to some extent conflicting case law exists on many of the issues involved. This is because the decision whether to certify a class, committed to the sound discretion of the district judge, *Mayer v. Mylod*, 988 F.2d 635, 640 (6th Cir.1993), turns on the particular facts and circumstances of each individual case. Given the far-reaching implications of certification, a court must in the broadest sense be satisfied that the fiduciary duties and responsibilities of the class representative and class counsel will be conscientiously, fairly, and justly discharged in order to protect the interests of the class.

### The Prerequisites Of Class Certification

The prerequisites of class certification are provided by Fed.R.Civ.P. 23(a). This rule provides that one or more members of a class may sue or be sued as representatives of the class only if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Plaintiff is required to meet each of these prerequisites, which are commonly known as "numerosity," "commonality," "typicality," and "adequacy."

### I.

### *Numerosity*

The first prerequisite of class certification is that the class is so numerous that joinder is impracticable. Plaintiff's amended complaint alleges that as of February 28, 1992, a month after the close of the original class period, Upjohn had approximately 190 million shares of common stock outstanding, held by approximately 32,000 shareholders of record. Complaint ¶ 7. The complaint additionally alleges that "millions" of shares changed hands during the class period. Complaint ¶ 22. Plaintiff further asserts hundreds of thousands of geographically-dispersed class members exist, clearly satisfying the numerosity requirement. Defendants do not contest plaintiff's assertion.

As one court pointed out, "the prerequisite expressed in Rule 23(a)(1) is generally assumed to have been met in class action suits involving nationally traded securities." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir.1981). The court concludes the numerosity requirement has been met.

### II.

### *Commonality*

The second prerequisite of class certification is that questions of law or fact exist which are common to the class. To bring a 10b–5 case based on either affirmative misstatements by corporate officers or directors, or omissions of information which render statements made by corporate officers or directors misleading, a plaintiff must allege the following: (1) a misstatement or omission; (2) made with scienter; (3) that is material; (4) upon which the plaintiff relied; (5) a causal link between defendant's misstatement or omission and defendant's damages; and (6) damages. *Platsis v. E.F. Hutton & Co.*, 946 F.2d 38, 40 (6th Cir.1991), *cert. denied*, 503 U.S. 984, 112 S.Ct. 1669, 118 L.Ed.2d 389 (1992).

Plaintiff correctly asserts that several elements of his case present questions which are common to the class. For example, plaintiff has identified various statements issued by Upjohn's officers and directors throughout the class period. Whether these statements were actually misstatements is a question common to the class. Further, should plaintiff demonstrate that Upjohn's officers or directors issued misstatements, the question of the intent with which the misstatements were made is common to the class.

For these reasons, I find that plaintiff has satisfied the commonality requirement of Rule 23(a)(2).

### III.

### *Typicality*

The third prerequisite of class certification is that the claims or defenses of the

representative parties are typical of the claims or defenses of the class. This prerequisite emphasizes that the class representative's interests in an action must be consistent with the interests of the class members. The rationale for this prerequisite is that a class representative with a typical claim "will pursue his or her own self-interest in the litigation and in so doing will advance the interests of the class members." 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, § 3.13, at 3–75 (3d ed. 1992).

Plaintiff made four purchases of Upjohn stock. On April 23, 1991, he purchased 100 shares at $45 per share. On April 30, 1991, he purchased an additional 100 shares at $43 per share. Made over two years after the commencement of the class period, these are plaintiff's only purchases in the revised class period, from January 21, 1989, through October 1, 1991. On August 16, 1991, plaintiff sold put options[1] for 500 shares of Upjohn stock for an option premium of $2.25 per share. On October 21, 1991, plaintiff purchased these shares for the agreed put option price of $45 per share. On November 1, 1991, plaintiff again sold put options for 500 shares of Upjohn stock for an option premium of $3.00 per share. On January 20, 1992, plaintiff purchased these shares for the agreed put option price of $45 per share.

Defendants allege that plaintiff is not typical for several reasons. First, defendants allege that because numerous curative statements were made throughout the class period, there is inherent conflict in the class making it impossible for anyone to be a typical representative for the entire class period. This argument will be considered below in the context of evaluating the presence of conflicts within the class.

Next, defendants challenge plaintiff's typicality with regard to the original class period because plaintiff purchased 1000 of his 1200 shares after the market already knew most, if not all, of the information plaintiff alleges should have been disclosed. For example, plaintiff's purchases resulting from put op-

tion sales were made after the market knew: (1) sales of Halcion had been suspended in the UK; and (2) there were errors in at least one of the studies submitted by Upjohn to the FDA in the drug's approval process.

In *Klein v. A.G. Becker Paribas Inc.*, 109 F.R.D. 646 (S.D.N.Y.1986), the court refused to extend a class period beyond the date of certain curative disclosures. The curative disclosures were reported by the Dow Jones wire and *The Boston Globe* newspaper. The court noted it could not rule on the merits of the plaintiffs' claims in the proposed extended period. However, it stated that the claims of plaintiffs in the period prior to the curative disclosure were different from those after the curative disclosure with regard to the materiality of the curative disclosure. It held, therefore, that the named plaintiffs whose claims originated prior to the disclosure were not typical of the plaintiffs whose claims originated after the curative disclosure. *Klein*, 109 F.R.D. at 652–53.

As in *Klein*, the original class period here includes a curative disclosure. Because plaintiff purchased 1,000 of his 1,200 shares after the curative disclosure, his interest in the case will be different with regard to the materiality of the curative disclosure than the interest of class members who purchased prior to the curative disclosure. This renders Mr. Acito an atypical plaintiff for the entire original class period.

Even assuming plaintiff had sought and obtained permission of the court to amend his complaint to terminate the class period October 1, 1991, a serious question exists in this case whether Acito himself in his personal purchases relied on the integrity of the market. A defense which is peculiar to the named plaintiff can destroy the named plaintiff's typicality. The reason typicality is destroyed is that such a defense can distract the named plaintiff to such an extent that his or her representation of the interests of the rest of the class will suffer. *See, e.g., J.H. Cohn & Co. v. Am. Appraisal Associates, Inc.*, 628 F.2d 994, 999 (7th Cir.1980); *Dubin*

---

1. A "put option" is a security that gives the holder the right, but not the obligation, to sell ("put") to the option writer ("seller") a specified number of underlying securities at a particular price within a given period of time. The seller earns an "option premium" paid by the holder for this right.

*v. Miller,* 132 F.R.D. 269, 275 (D.Colo.1990); *Wagner v. Lehman Bros. Kuhn Loeb Inc.,* 646 F.Supp. 643, 660 n. 20 (N.D.Ill.1986).

 Plaintiff, presumably acting on behalf of the entire class, is proceeding on a "fraud on the market theory." In doing so, he depends on the presumption of reliance on market price as articulated in *Basic.* This presumption of reliance may be rebutted by demonstrating that a plaintiff, even had he or she known the truthful information that was not disclosed, would nevertheless still have purchased the stock at the same price. *Basic,* 485 U.S. at 248–49, 108 S.Ct. at 992–93. The defense of non-reliance alone is not a basis for denial of class certification. Such a defense goes to the merits, and cannot be considered in a certification motion. However, courts have concluded that "[a] named plaintiff who is subject to an arguable defense of non-reliance on the market ... [is] subject to a unique defense, and therefore, atypical of the class under Rule 23(a)(3)." *In re Harcourt Brace Jovanovich, Inc. Sec. Litig.,* 838 F.Supp. 109, 113 (S.D.N.Y.1993); *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508–09 (9th Cir.1992).

 Plaintiff purchased 100 shares of Upjohn stock on April 23, 1991, at $45 per share. Plaintiff again purchased 500 shares of Upjohn stock on October 21, 1991, at $45 per share. The relationship of the dates of these purchases to the dates of the original and revised class periods is shown below:

By offering to end the class period on October 1, 1991, plaintiff concedes that as of that date, the allegedly undisclosed information was disclosed.[2] The evidence before the court clearly shows that plaintiff purchased Upjohn stock at the same price both several months before and shortly after October 1, 1991. Thus, a question arises as to whether plaintiff was in fact relying on the market price. Such a question presents an arguable defense unique to plaintiff.

Plaintiff characterizes the October 21, 1991, purchase as involuntary because it resulted from his put option sales. However, defendants noted at oral argument that on several dates following the curative disclosure on October 1, 1991, which ends the revised class period, plaintiff could have covered his put option sale by purchasing put options, and putting the stock on someone else. Defendants also noted that on several dates following the curative disclosure on October 1, 1991, plaintiff could have purchased put options for *less* than what he made selling them. That plaintiff could have avoided the post disclosure purchase *and still have made a profit* calls into question plaintiff's characterization of the purchase as involuntary.

Without addressing the merits of plaintiff's individual case, it is clear that serious questions exist as to whether plaintiff's claims are in fact typical of the claims in either class period. Since the burden of proof is upon plaintiff to convince the court his claims are typical, I conclude that he has not met that burden.

2. There is no evidence before the court, however, demonstrating that this concession is actually Mr. Acito's. In his deposition, he stated that in his mind, the January 20, 1992, *New York Times* article was the pivotal event causing him to initiate this lawsuit. Plaintiff's counsel have submitted nothing demonstrating that, or why, Mr. Acito has changed his mind.

## IV.

### Adequacy

■ The final prerequisite of class certification under Rule 23(a) is that the representative parties will fairly and adequately protect the interests of the class. Because of the binding effect of any judgment on absent class members, the adequacy of representation is crucial. *See* 7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1765 at 266–67 (2d Ed.1986); *see also, Smith v. Babcock,* 19 F.3d 257, 265 n. 13 (6th Cir.1994). What constitutes adequate representation is a question of fact to be determined by the circumstances of each case. Wright, Miller & Kane, *supra* § 1765 at 271; *see also, Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 728 (11th Cir.1987), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1220, 1221, 99 L.Ed.2d 421 (1988). ("[T]he adequacy of class representation is primarily a factual issue that is best left for determination by the district court.")

■ When determining the adequacy of representation, the district court should consider both "whether there is any antagonism between the interests of the plaintiffs and other members of the class" and also "the experience and ability of counsel for the plaintiffs." *Cross v. National Trust Life Insurance Co.,* 553 F.2d 1026, 1031 (6th Cir. 1977) (citing *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 562 (2d Cir.1968)). Applying these standards, I conclude that neither plaintiff nor his counsel satisfy the adequacy requirement of Rule 23(a)(4).

### A. *Class Conflicts*

■ To satisfy the adequacy test, the named representative of a class need only be adequate and need not be the best of all possible plaintiffs. *Ashe v. Board of Elections in City of New York,* 124 F.R.D. 45, 50 (E.D.N.Y.1989). However, there must not be antagonism between the interests of the named plaintiff and the interests of the rest of the class. *Cross,* 553 F.2d at 1031. Mr. Acito fails to meet this minimum standard.

### 1. *The Seagate II Approach*

A considerable portion of the parties' briefs, as well as a significant amount of time at oral argument, was devoted to the subject of class conflict. Central to the debate was a recent decision from the Northern District of California, *In re Seagate Technology II Sec. Litig.,* 843 F.Supp. 1341 (N.D.Cal.1994) (*"Seagate II"*). Because the parties have directed so much attention to the court's decision in *Seagate II,* I take it up as a preliminary matter.

As noted above, a plaintiff such as in this case bringing a 10b–5 claim based on either affirmative misstatements by corporate officers or directors, or omissions of information which render statements made by corporate officers or directors misleading, must prove by a preponderance of the evidence the following: (1) a misstatement or omission; (2) made with scienter; (3) that is material; (4) upon which the plaintiff relied; (5) a causal link between defendant's misstatement or omission and defendant's damages; and (6) damages.

In *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), a case involving affirmative misrepresentations, the Supreme Court stated, with respect to the requirement of reliance, that where misrepresentations are made regarding securities traded on an open and developed market, a rebuttable presumption of reliance exists:

> An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in the market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action.

*Basic,* 485 U.S. at 247, 108 S.Ct. at 992.

In *Seagate II,* Judge Walker wrote that the presumption of reliance has fundamentally changed the 10b–5 cause of action. He attributed the change not so much to the presumption itself, as to the theory underlying it. This theory is that all material misrepresentations or omissions are automatically taken into account in a security's market

price. He noted, in the words of a commentator, that

(a)cceptance of the logic of the fraud on the market theory ... leads to the conclusion that there is no need in a securities fraud case for separate inquiries into materiality, reliance, causation, and damages. These inquiries are necessary in a face-to-face transaction where each party must make a subjective valuation of information provided by the other party, but irrelevant in open market transactions where the market price transmits all the relevant information.

*Id.,* at 1357, quoting Daniel R. Fischel, *Use of Modern Finance Theory in Securities Fraud Cases,* 38 Bus. Law 1, 13 (1982).

In Judge Walker's analysis, the 10b–5 cause of action has been essentially reduced to proof of three elements. The first two elements, proof of a misstatement or an omission, and scienter, remain unchanged from prior practice. Judge Walker identifies a new third element, however, which he regards as the "linchpin" of 10b–5 cases. *Seagate II,* 843 F.Supp. at 1357. This third element is proof of a variation in a security's market price which is not fairly attributable to any factor other than fraud. Proof of this new third element effectively replaces proof of materiality, reliance, cause, and damages.

*Seagate II* concerned a corporation's alleged omissions and misrepresentations concerning its business prospects. Plaintiffs alleged that as a result of the omissions and misrepresentations, the corporation's stock traded at a fraudulently inflated price for a period of several months. Plaintiffs further alleged that because the defendant corporation made a series of partially curative disclosures during this time, the inflation resulting from the fraud dissipated gradually rather than suddenly. The case had been provisionally certified for class action treatment. Four subclasses had been identified based on the dates of the partial curative disclosures. However, the parties sought clarification of various certification issues as they prepared for trial.

Against this backdrop, and with its focus on the importance of proof of price inflation for a 10b–5 cause of action, the court identified two sources of class conflict which it considered potentially fatal to certification under Rule 23. The first source of class conflict was between individuals who purchased, and individuals who sold, during any of the identified subclass periods.

The court noted that damages in a 10b–5 case are generally determined by an "out-of-pocket" measure, that is, the amount of price inflation paid by the plaintiff. This is calculated by determining the difference between the inflated market price paid for the security, and what the security would have been worth had there been no fraudulent misstatements or omissions. Determining the inflated market price paid for the security is of course straightforward. However, determining what the security would have been worth had there been no fraudulent misstatements or omissions involves examining numerous market forces as well as employing complex statistical analysis. *Id.,* at 1348–1350.

The amount of damage suffered by an individual who purchases during the class period and who does not sell until after the class period is simply the price inflation at the time of purchase. However, calculating the amount of damage for an individual who purchases during one subclass period and sells during another must take an additional factor into account. In that case, while the individual suffers from the price inflation at time of purchase, he or she benefits from the price inflation at time of sale. Thus, the amount of damage for an individual who purchases during one subclass period and sells during another will be the price inflation at purchase minus the price inflation at sale.

The conflict between sellers and purchasers in each of the subclass periods results from the way in which sellers and purchasers will attempt to shape the evidence of price inflation to maximize their own recovery in that subclass period. Those selling during any given subclass period will wish to minimize the amount of price inflation existing during that period. However, those purchasing during the same subclass period will wish to maximize the amount of price inflation during that period. In short, the interests of

purchasers and sellers in any given subclass period will always be exactly opposite.

The second source of conflict that the court in *Seagate II* identified as potentially fatal to certification under Rule 23 is the conflict between plaintiffs who purchased during the class period and never sold ("equity plaintiffs"), and plaintiffs who purchased during the class period but who have sold ("non-equity plaintiffs"). Equity plaintiffs who continue to own an interest in the defendant company will wish to moderate the case because while it is in their interest to recover damages, they will also desire to limit the total liability of the corporation to protect their holdings. In contrast, non-equity plaintiffs are indifferent to the negative effect that a large damage award might have on a defendant corporation. Consequently, they will seek to enhance the evidence of corporate wrongdoing without reservation. *Id.*, at 1362. Thus irrespective of the subclass period in which a plaintiff purchased stock, there will be an underlying conflict between those who have subsequently sold their stock, and those who have retained it.

In *Seagate II*, the court found both because of the potential presence of class conflicts in regard to proof of price inflation, and because the issue of price inflation went not only to the issue of damages, but also to materiality, cause, and reliance, the alignment of interests necessary for class treatment might not be present in a case involving a number of partial curative disclosures over a period of several months. Observing that it was departing from the expansive reading generally given to *Eisen*, 417 U.S. at 177, 94 S.Ct. at 2152, the court ordered an evidentiary hearing to examine the makeup of the class. The court's intention was to determine the actual severity of the potential conflicts.

The hearing, however, was never held. In response to the court's opinion, the plaintiffs agreed to modify the class so that it consisted only of those who purchased prior to the first partially curative disclosure, and who retained their stock throughout the class period. As a result, the court certified the class. *In re Seagate Technology II Sec. Litig.*, 156 F.R.D. 229 (N.D.Cal.1994).

2. *Applying Seagate II To The Present Facts*

Here defendants assert that the logic of *Seagate II* applies directly to the facts of this case. They state that plaintiff, in his complaint, has alleged nine misrepresentations, fifteen omissions, and nineteen curative statements on thirty-one different occasions. The consequence of so many alterations in the total mix of information available to the market, according to defendants, renders the proposed class rife with class conflict. Defendants' expert opines that in order to eliminate the conflicts emanating from documents cited in plaintiff's complaint, the court would be forced to certify no fewer than 496 subclasses.

Plaintiff responds by labelling *Seagate II* an aberration, and offering several opinions from courts declining to follow it. *See In re Ast Research Sec. Litig.*, No. CV–94–1370 SVW (SHx), 1994 WL 722888 (C.D.Cal. November 10, 1994); *Yamner v. Boich*, [Current Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,427, 1994 WL 514035 (N.D.Cal.1994); *In re Scorpion Technologies, Inc. Sec. Litig.*, No. C. 93–20333 R.P.A. (N.D.Cal. August 1, 1994); *Welling v. Alexy (In re Cirrus Logic Sec.)*, 155 F.R.D. 654 (N.D.Cal.1994); *In re Proxima Corporation Sec. Litig.*, [1993–1994 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,236, 1994 WL 374306 (S.D.Cal.1994). Plaintiff also distinguishes this case factually from *Seagate II.* He claims he never alleged that there were any partial curative disclosures, and in any event that shortening the class period eliminates any "arguable" partial curative disclosures.

None of the cases cited by plaintiff have refuted the arguments of *Seagate II* with the intellectual rigor demonstrated by Judge Walker. Further, they principally rely on a Ninth Circuit case which held that "[a]ny conflicting interests in tracing fluctuations in inflation during the class period are secondary, and do not bar class litigation to advance predominately common interests." *Blackie v. Barrack*, 524 F.2d 891, 910 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). *Blackie*, however, dealt with a different factual scenario than *Seagate*

II. In *Blackie*, the court stressed that despite several partially curative disclosures, the "major portion of the inflation" was alleged to persist throughout the class period. *Id.*, at 909, 910. The effect of class conflicts on damages was thus small. In *Seagate II*, the value "ratcheted down, dropping from $22 per share ... to about $7 per share." *Seagate II*, 843 F.Supp. at 1344. With numerous significant price changes, the effect of class conflicts on damages had the potential to be significant.

Further, while it is true, strictly speaking, that plaintiff has never formally alleged that defendants made any partial curative disclosures, plaintiff's own pleadings reveal that partially curative disclosures occurred. For example, in his amended complaint plaintiff refers to an August 28, 1991, article from *The Washington Post* in which defendants are quoted as admitting that research data on Halcion submitted to the FDA was incomplete. Further, in his motion for class certification, plaintiff acknowledges that class members have been exposed to a varying "quantum of hype" throughout the class period.

I find Judge Walker's opinion in *Seagate II* to be a scholarly and thoughtful exposition of two potential sources of significant class conflict that go beyond mere calculation of damages. For this reason, I disagree with plaintiff's contention that the case is an aberration best ignored. Further, there are many similarities between the facts of *Seagate II* and the facts here. It is reasonable to assume that this case will involve a large number of sellers and buyers whose interests will conflict with respect to proof of price inflation. An individual who purchased at the beginning of the class period, but sold prior to the time plaintiff purchased, would not share plaintiff's desire to show that the maximum price inflation continued throughout the class period.

### 3. *A More Conventional Approach*

Defendants urge the court to adopt and apply Judge Walker's reasoning in *Seagate II*. However, I find that the court need not adopt *Seagate II* in order to find Mr. Acito is an inadequate plaintiff, because Mr. Acito fails to satisfy the adequacy test under more conventional measures.

■ First, I have already explained that Mr. Acito has failed to demonstrate that he is a typical plaintiff, whether the class period ends on January 20, 1992, as pleaded in plaintiff's amended complaint, or on October 1, 1991, as suggested in plaintiff's reply brief in support of class certification. The adequacy test "includes, but is broader than, the typicality test." 1 Herbert Newberg & Alba Conte, *Newberg on Class Actions*, § 3.22 at 3–128 (3d ed. 1992). *See also, General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, at 157–58, n. 13, 102 S.Ct. 2364, 2371, n. 13, 72 L.Ed.2d 740 (1982) (adequacy test merges with typicality test, but adequacy test "also raises concerns about the competency of class counsel and conflicts of interest"); *Eisen*, 391 F.2d 555, 563 (2d Cir.1968) (adequacy requirement "amounts to little more than an alternative way of stating that the plaintiff's claim must be typical"). If Mr. Acito is not typical of the class, he cannot be an adequate representative. *See, e.g., Turner v. A.B. Carter, Inc.*, 85 F.R.D. 360, 369 (E.D.Va.1980). ("Lack of sufficient Rule 23(a)(3) typicality implicates directly a lack of Rule 23(a)(4) adequate representation.")

■ Moreover, as discussed above, to satisfy the adequacy of representation requirement, the named representative "must have common interests with unnamed members of the class." *Senter v. General Motors Corp.*, 532 F.2d 511, 525 (6th Cir.), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976). Plaintiff's counsel have now, informally at least, attempted to revise the class period by ending the class on October 1, 1991, rather than January 20, 1992, as set forth in the amended complaint. Assuming the court proceeds on the basis of this truncated class period, Mr. Acito must have interests common to unnamed members who purchased their stock prior to the end of the class period on October 1, 1991. The record of Mr. Acito's purchases, on its face, reveals that he purchased 1,000 of his 1,200 shares after October 1, 1991, pursuant to put option transactions. He purchased the first 500 shares pursuant to a transaction entered into prior to October 1, 1991, but he subsequently

had the opportunity to cover that put option purchase, and he chose not to do so. Moreover, he made the decision to enter into the second put option transaction, involving the other 500 shares, after October 1, 1991. *See supra* at 481.

Accordingly, since 1,000 of his total holdings of 1,200 shares were purchased after October 1, 1991, it is in Mr. Acito's interest to argue that January 20, 1992, not October 1, 1991, was the crucial disclosure date. In fact, Mr. Acito himself denied that the ban of Halcion in the United Kingdom had any influence on his decision to purchase. Defendants' Brief in Opposition to Class Certification ("Def.Br."), Ex. 11, Acito Dep. at 315. Consequently, the October 1, 1991, date is meaningless to Acito but not to the rest of the class. I cannot fairly conclude, therefore, that Mr. Acito's interests coincide with those of the rest of the class during the revised class period.

■■■■■ Moreover, an adequate plaintiff must be sufficiently interested in the case to ensure its vigorous prosecution. *Senter,* 532 F.2d at 525. I recognize that in securities class actions, "class certification should not be denied simply because of a perceived lack of subjective interest on the part of the named plaintiffs." *Kirkpatrick,* 827 F.2d at 728. Likewise it would be naive not to understand that many of these class actions are lawyer-driven. Nevertheless, the participation of named plaintiffs must not be "so minimal that they virtually have abdicated to their attorneys the conduct of the case." *Id. See also, Welling v. Alexy,* 155 F.R.D. 654, 659 (N.D.Cal.1994) (named plaintiff deemed inadequate in part due to lack of interest in supervising his attorneys).

Defendants suggest Mr. Acito is a professional plaintiff, a mere hired gun who regularly abdicates all responsibility for his cases to his attorneys. They point out that he is a named plaintiff in two other securities actions, *Acito v. Imcera Group, Inc.,* No. 92 Civ. 1472 (S.D.N.Y.), and *In re MCA Shareholders Litigation,* No. 11740 (Del.Ch.). They contend that he was not even aware that the *Imcera* case had been dismissed three months prior to his deposition in this case. Def.Br., Ex. 11, Acito Dep. at 205–08.

■■■ However, I need not rely on Mr. Acito's disinterest in other cases to infer his disinterest here. The record is silent on Mr. Acito's participation in any of the crucial decisions which could affect the rights of the hundreds, if not thousands, of shareholders in this potential class. There is no evidence before the court that Mr. Acito selected or ratified the selection of the numerous attorneys involved in this case, or that he considered the potential cost to the class arising from the participation of so many firms.

Moreover, despite the radical effect of the truncated class period on Mr. Acito's claim, he has failed to comment on the change. If he has not been apprised of the change, that reflects poorly on the adequacy of his counsel, as I discuss below. If, on the other hand, he is aware of it, then his failure to assure the court that he supports the change reflects poorly on his interest in the case. It also calls into question his ability to represent the unnamed members of the class, because he has shown no regard for the unnamed members whose claims, like his, are substantially diminished, if not totally eliminated, by the proposed alteration. Mr. Acito's silent compliance with his counsel's casual, back-handed reduction of the class period strongly suggests he has abdicated his leadership role.

In sum, Mr. Acito has failed to show that he is typical under either proposed class period. His interests are not common to the rest of the class during the revised class period. His failure to comment on the proposed revision of the class period evinces his disinterest in this litigation. For these reasons, I find that Mr. Acito is an inadequate class representative.

### B. *Performance of Plaintiff's Counsel*

■■■ Even if Mr. Acito were an adequate representative, the adequacy of representation depends not only on the interest and involvement of the named class representative, but also on the qualifications, experience and conduct of class counsel. *Roman v. Korson,* 152 F.R.D. 101, 106 (W.D.Mich. 1993). To satisfy the adequacy requirement, "it must appear that the representatives will vigorously prosecute the interests of the

class through qualified counsel." *Senter*, 532 F.2d at 525. Accordingly, counsel for the plaintiff class must be "qualified, experienced and generally able to conduct the proposed litigation." *Eisen*, 391 F.2d at 562.

Three firms, designating themselves co-lead counsel, seek approval as class counsel. These firms are Wechsler, Skirnick, Harwood, Halebian & Feffer; Abbey & Ellis; and Kohn, Nast & Graf, P.C. To certify the class, I must be satisfied that these three firms, referred to throughout the opinion as "plaintiff's counsel," will adequately represent the class.

Judging the competency of lawyers in any given case is a serious responsibility not to be taken lightly. Lawyers today work under tremendous pressures, perhaps not known to judges who have been on the bench for a number of years. The drive for billable hours, the acceptance of advertising and the highly-competitive nature of the profession may, in combination, have an adverse effect on the quality of a lawyer's work product. Also, of course, many decisions dictated by the client and not known by the court may occur in the privacy of the law office between clients and lawyers, or between firms, which could affect a lawyer's performance. It must also be recognized that the practice of law is in many ways highly individualistic and what may appear incompetent to one observer might be considered highly innovative and appropriate to another. Certainly no judge has the right to expect lawyers to treat a case in his or her court as though it was the lawyer's only case.

As an aside, it is noted that although the inadequacy of plaintiff's counsel has been argued vigorously by defense counsel, I agree with Judge Zagel, who commented in *Williams v. Balcor Pension Investors*, 150 F.R.D. 109, 119 n. 10 (N.D.Ill.1993), "One has to take objections by defendant to adequacy of class counsel with a grain of salt." Unless the practice of law has changed dramatically since I was in practice, I never knew a defense lawyer who wasn't always delighted if opposing counsel was inexperienced, incompetent and perhaps less than adequate to the task. But, regardless of defendant's position, the court itself has an important, independent responsibility to the unnamed members of the class to make sure the class attorneys are "qualified, experienced and generally able to conduct the proposed litigation." *Eisen*, 391 F.2d at 582. With these general principles in mind, I now address specifically the issues of plaintiff's counsel's adequacy to represent the class.

Counsel for the plaintiff class have supplied the court with firm resumes of co-lead counsel. These resumes recount co-lead counsel's experience and success in the field of class action securities litigation. *See* Aff. of Jill Abrams in Support of Amended Motion for Class Certification. Although these accounts are impressive, "the extreme importance of the inquiry into the adequacy of counsel means that the court should not be easily satisfied with a self-serving and one-sided statement by the class attorney that he meets the requirements of the rule." 7A Charles A. Wright *et al., Federal Practice & Procedure* § 1769.1 at 383 (2d ed. 1986).

Moreover, it is not reputation built upon past practice, but rather competence displayed by present performance, which demonstrates the adequacy of counsel in a class action. *See, e.g., Balcor*, 150 F.R.D. at 112 n. 1. ("Of course, any decision about whether counsel for the putative class is adequate must be based on its handling of this case.") *Grimes v. Pitney Bowes Inc.*, 100 F.R.D. 265, 271 (N.D.Ga.1983); ("It is, however, immaterial as to why [plaintiffs' counsel] did not live up to their past practice, for the issue is whether or not it is fair that other members of the class be bound by their achievements in this case."); *Johnson v. Shreveport Garment Co.*, 422 F.Supp. 526, 535 (W.D.La.1976), *aff'd*, 577 F.2d 1132 (5th Cir.1978) ("Counsel need not come to court with a resume and character references with which to prove his effectiveness; rather, his or her conduct in pretrial matters, discovery and the trial itself will be evidence of his or her capability adequately to represent the class.").

The court recognizes plaintiff's counsel may have rendered excellent representation for other plaintiffs, in other class actions, at other times, and in other courts. The court also recognizes that in the absence of a show-

ing to the contrary, adequacy of counsel is often presumed. *See* Wright, *supra* § 1765 at 277–79. Further, some authorities state that the burden is on the defendant to prove that plaintiff's counsel is inadequate. *See* 10 Louis Loss & Joel Seligman, *Securities Regulation* 4597 (3d ed. 1993) (citing *Peil v. Speiser,* 97 F.R.D. 657, 661 (E.D.Pa.1983)).

This may be an oversimplification, since the trial court has a duty "to protect both the absent class and the integrity of the judicial process by monitoring the actions of the parties before it." *Deposit Guaranty Nat'l Bank v. Roper,* 445 U.S. 326, 331, 100 S.Ct. 1166, 1170, 63 L.Ed.2d 427 (1980) (identifying interests implicated by questions of justiciability in class action context). I could not fulfill that duty without satisfying myself that plaintiff's counsel are adequate, notwithstanding defendants' objections. Moreover, it is the plaintiff who seeks class certification, and the plaintiff who must ultimately satisfy the court that certification is appropriate. *See, e.g., Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1038 (5th Cir.1981) ("A plaintiff who seeks to certify his suit as a class action under Federal Rule of Civil Procedure 23 must establish a number of specific prerequisites, and in *each* case the burden of proof is on the plaintiff. . . .") (emphasis added). In any event, defendants here have persuasively challenged plaintiff's counsel's adequacy. For the following reasons, I am satisfied that the three co-lead counsel firms fail to meet the minimum standards of Rule 23.

1. *Failure to Conduct an Adequate Investigation of Proposed Class Representatives.*

Plaintiff's counsel inexcusably bollixed their selection of class representatives. I previously addressed this problem in my opinion of May 27, 1994, where I discussed at length the deficiencies of several of the proposed plaintiffs and their counsel. Nevertheless, because counsel's early-on activity in a class action suit is vital to the ultimate success of the litigation, it becomes an important indication of counsel's competence. Accordingly, I shall briefly recount counsel's earliest shortcomings.

First and foremost, counsel selected a phantom plaintiff, Jean Giles. Counsel named Giles as a plaintiff in both the original and amended complaints. However, it later became painfully clear to all parties and to this court that counsel had named Giles without knowing who, let alone where, Giles was. Not one of the co-lead counsel firms initially made any investigation to determine who Giles was, where she came from, or how she ever became a named plaintiff. Counsel began making inquiries about Giles only after discovery deadlines came and went without any response from a person by that name. Counsel were unable to locate Giles even after a comprehensive computer search throughout the United States. To this day, the court has no reason to believe Giles ever existed.

Plaintiff's counsel fared only slightly better in their selection of other class representatives. They named Larry Rabinovits as a proposed class representative, but discovery revealed Rabinovits never purchased Upjohn stock during the class period. They also named Paul Longo, who explained in his deposition that he was openly solicited by an attorney from Philadelphia. Although open solicitation is no longer frowned upon as in the past, Longo's deposition revealed that he had no further contact with any of the attorneys involved in this case prior to the time he was named as a plaintiff in the original and consolidated complaints.

Plaintiff's counsel also named Diane Abbey and Jonathan Abbey, wife and son of Arthur Abbey, the senior partner of Abbey & Ellis. Defendants contend Diane and Jonathan Abbey "were proffered as nominal class representatives just long enough to hold a place for Abbey & Ellis in the race to become lead counsel in this lawsuit." Def.Br. at 45. I see no reason to doubt this contention, given that these two named plaintiffs were dropped from the case within days. *See* Dkt. No. 3.

With the exception of Mr. Acito, whose inadequacies as a class representative have been discussed above, all of the remaining named plaintiffs either withdrew or were dismissed from the case after failing to comply with discovery. These recalcitrant plaintiffs include Victoria Shaev, who was voluntarily

dismissed without prejudice after she complied with a court order requiring her to complete her deposition; Robert Guendelsberger, who cancelled his court-ordered deposition on two occasions without leave of court and was voluntarily dismissed without prejudice after he was finally deposed; and Stefania Ziemak, whom this court dismissed without prejudice for her willful failure to produce documents despite court orders that she do so. The named plaintiffs also included Ellen Klein, Eli Ballan, and Herman Ratner, who voluntarily withdrew from the case.

 This failure to make a reasonable pre-filing investigation of proposed class representatives is sufficient to find counsel inadequate. In *Balcor*, 150 F.R.D. at 109, the plaintiff purchasers of defendants' limited partnership interests sought to certify a class alleging violations of state and federal securities law, based on misrepresentations and omissions in defendants' offering materials. The court refused to certify the class, observing that all six of the proposed class representatives were inadequate. The court also found that the failure of class counsel to discover the deficiencies of the proposed class representatives established the inadequacy of class counsel. The court observed:

> When an attack on the class representatives is made, the court may weigh (and, in this case, the defendants ask us to weigh) not only the adequacy of class representatives but, if they are inadequate even under loose standards, whether the action of potential class counsel in selecting them creates some doubt about counsel's ability to serve as lead counsel in this suit. If we recognize that counsel have a lot to do with assembling the elements of a class action law suit, including finding plaintiffs, then class counsel ought to do a good job of it.

*Balcor*, 150 F.R.D. at 118–19.

The language of the *Balcor* opinion applies with equal force in this case. By any reasonable standard plaintiff's counsel have done an appalling job of selecting class representatives, and the court cannot ignore how that fact reflects on the ability of counsel to represent this class. Therefore, the first reason why I find plaintiff's counsel inadequate is

their failure to conduct even a passable investigation of the proposed named plaintiffs.

### 2. *Failure to Comply with Court Rules and Discovery*

Secondly, "[t]hroughout this litigation, Plaintiff's counsel have shown themselves to be unable or unwilling to comply with the most basic rules of court." Def.Br. at 49.

Plaintiff's counsel ignored Local Rule 28(c) by filing opposition papers to defendants' motions for sanctions three weeks late on two occasions. Local Rule 28(c) requires opposition papers to nondispositive motions to be filed within fourteen days. On October 25, 1993, defendants filed a motion for sanctions, to which plaintiff's counsel did not respond until November 29, 1993—21 days late. On December 10, 1993, defendants filed an amended motion for sanctions, to which plaintiff's counsel did not respond until January 18, 1994—22 days late. Plaintiff's counsel did not request an extension of time from the court for either motion.

In the context of their other deficiencies, this misconduct supports a conclusion that plaintiff's counsel are not adequate representatives of the class. *See, e.g., Ferrell v. Busbee*, 91 F.R.D. 225, 233–34 (N.D.Ga.1981) (failure to follow local rules cited among counsel's deficiencies); *Sicinski v. Reliance Funding Corp.*, 82 F.R.D. 730, 734 n. 2 (S.D.N.Y.1979) (one reason for finding counsel inadequate included fact that counsel "filed papers late several times").

Plaintiff's counsel have also failed to cooperate with discovery. The deposition of named plaintiff Victoria Shaev serves as the best example. That deposition was scheduled to take place in Grand Rapids, over a two-day period. Plaintiff's counsel terminated the deposition early, over defense counsel's objection. As I explained in my opinion of May 27, 1994, plaintiff's counsel subsequently sought a protective order, asking the court to declare Shaev's deposition officially terminated. They complained that Shaev's deposition had gone on long enough, that defendants had wasted their time with irrelevant inquiries, that defense counsel had been abusive, and that requiring Shaev to return

to Grand Rapids to continue her deposition would be unduly burdensome.

On December 22, 1993, Magistrate Judge Scoville denied plaintiff's motion. He commented, "Plaintiff's request for relief is bold, to say the least, in light of plaintiff's admitted failure to comply with this court's previous discovery orders." Mem.Op. at 6. Judge Scoville specifically found that defense counsel had not engaged in any discovery abuses. Rather, he found plaintiff's counsel guilty of discovery misconduct. He noted that "[o]n virtually every page of the transcript, plaintiff's attorney interrupted with a statement or an attempt to coach the witness. In addition, counsel instructed the witness not to answer. The amended federal rules now make it patent that such conduct is improper and disruptive." Id. n. 1. Judge Scoville concluded, "plaintiffs have wasted their resources and those of defendants and the court in seeking relief to which they are plainly not entitled." Id. at 8.

█ Discovery misconduct is grounds for finding counsel inadequate. See, e.g., Wrighten v. Metropolitan Hospitals, Inc., 726 F.2d 1346, 1351-52 (9th Cir.1984). Therefore, I further find counsel to be inadequate because they failed to comply with court rules and discovery.

### 3. Conflict of Interest Claims

Defendants argue the court should find plaintiff's counsel to be inadequate because the law firm of Wechsler, Skirnick, Harwood, Halebian & Feffer and the law offices of Curtis V. Trinko continue to be involved in this suit. Defendants' concern arises because Curtis Trinko and senior partner Stuart Wechsler of Wechsler, Skirnick are currently representing the interests of tort claimants in Halcion products liability actions against Upjohn.[3] Defendants argue that the interests of the current shareholder plaintiffs, who wish to see Upjohn prosper, are directly adverse to the interests of the tort claimants, who seek a large damage award from Upjohn. Defendants contend counsel's

representation of these conflicting interests violates established ethical rules.

Plaintiff's counsel respond by arguing that defendants previously raised this issue before Magistrate Judge Scoville. They allege Judge Scoville directed defendants either to make a motion to disqualify Trinko and Wechsler, Skirnick, or to cease to raise the issue. Therefore, argue plaintiff's counsel, defendants are now estopped to argue the conflict of interest. Moreover, plaintiff's counsel allege they procured a letter from Professor Geoffrey Hazard, a renowned ethics expert, who opined there was no conflict.

The court finds that neither party has sufficiently briefed the conflict question for the court fairly to ascertain whether a conflict exists. Even so, defendants' charges against plaintiff's counsel are serious, and should have been met with a more substantial defense. Plaintiff's counsel have never supplied the court with the date, time or place of Judge Scoville's alleged remarks, and upon review of the record, the court concludes that whatever remarks Judge Scoville may have made were never embodied in any order. Moreover, plaintiff's counsel have never filed a copy of Professor Hazard's letter with the court. If plaintiff's counsel are content to rest on such a flimsy defense to these serious charges, it confirms the court's doubts concerning their adequacy.

### 4. Failure to Remedy Deficiencies

I have repeatedly given plaintiff's counsel the benefit of the doubt throughout this litigation. As early as the spring of 1993, the conduct of plaintiff's counsel during discovery prompted defendants to make a motion for sanctions as to all class representatives, except Shaev. In an order dated September 10, 1993, I held defendants' motion for sanctions in abeyance, in order to give each of the then-named plaintiffs—some of whom sought withdrawal from the case—another opportunity to comply with discovery.

In late 1993, defendants again moved for sanctions, this time against then-named plaintiffs Shaev, Guendelsberger, Ziemak,

---

**3.** In plaintiff's reply brief, plaintiff argues that the law office of Curtis Trinko has moved to withdraw from the Halcion tort case in which it

was involved. The court has no knowledge, however, as to whether Trinko has now in fact withdrawn.

and Giles. The evidence before the court at the time supported a conclusion that plaintiff's counsel had knowingly and willfully concealed from the court their inability to locate Giles. In an order dated April 21, 1994, I granted defendants' motion for sanctions, and assessed a fine against individual attorneys from the co-lead counsel firms.

Subsequently plaintiff's counsel submitted circumstantial evidence, previously unknown to the court, which suggested that co-lead counsel had not willfully concealed their inability to locate Giles. Again giving plaintiff's counsel the benefit of the doubt, I concluded that co-lead counsel had not intentionally misled the court. I reconsidered and withdrew my order of April 21, 1994, by an order dated May 27, 1994. The May 27, 1994, order imposed minor sanctions on attorneys from the co-lead firms, based on their inexcusable negligence in "losing" a named plaintiff.

In my opinion of April 21, 1994, addressing defendants' motions for sanctions, I remarked, "While I do not make a final determination on the issue of certification at this time, I have serious doubts about whether co-lead counsel, individually as well as their firms, would adequately represent unnamed plaintiffs in the potential class." Op. of April 21, 1994 at 25. I also remarked, "Rather than deny the motion to certify [the] class at a later time, the court is taking this opportunity to identify the problem with the expectation that it will be resolved." *Id.* at 26. When that opinion was withdrawn by my order of May 27, 1994, those cautionary words were deleted from the revised opinion. Even so, the earlier opinion was filed and distributed prior to its withdrawal, and I would expect plaintiff's counsel to take the warning to heart.

Instead, plaintiff's counsel have retained the same organizational structure which led to the Jean Giles fiasco. There are still three co-lead counsel in this case. Although "[t]he functions of lead counsel may be handled by one person or by several," still "the number should not be so large as to hamper the unity of direction that is needed." *Manual for Complex Litigation, Second* § 20.22 at 16. Unity of direction has heretofore been utterly lacking in this case. In the throes of the Jean Giles affair, none of plaintiff's counsel admitted direct responsibility. Each of the firms designated as "co-lead" counsel was quick to point the finger at someone else, and none assumed ultimate accountability.

Since that time there has been no improvement. Eight law firms submitted plaintiff's brief in support of the motion for class certification. Seven of the firms no longer have clients in the case. Only one represents the sole remaining named plaintiff in this lawsuit, Mr. Acito. That firm, Wolf, Popper, Ross, Wolf & Jones, was not even present at the hearing on plaintiff's amended motion for class certification, nor was Mr. Acito himself present. None of the three firms designated as co-lead counsel represent any named plaintiffs—their clients have withdrawn or been dismissed. Nowhere in their brief do plaintiff's counsel attempt to explain why so many law firms without individual clients continue to be involved in this case.

At oral argument, attorney Jill Abrams of Abbey & Ellis admitted she had never spoken with Mr. Acito. She asserted that she had spoken with Mr. Acito's attorney, Robert Kornreich of the Wolf, Popper firm. Based on her conversations with Mr. Kornreich, she assured the court that Mr. Acito approved of the continuing participation of the firms designated as co-lead counsel, as well as the involvement of the other firms. Given the unimpressive history of this case, such assurances are not enough. I would expect that co-lead counsel, having already been sanctioned in part for their failure to coordinate the duties and responsibilities of the named plaintiffs, would at least attempt to speak with the one and only named plaintiff they have left. I would also expect that in a case with eight law firms and one plaintiff, co-lead counsel could satisfy the court that the remaining plaintiff was willing and able to supervise so many firms. I would further expect co-lead counsel to satisfy the court that the remaining plaintiff had determined the class would not be burdened by any unnecessary expenses arising from the presence of a legion of lawyers.

My concerns are further compounded by plaintiff's counsel's attempt to shorten the

class period from January 20, 1992, to October 1, 1991. In their brief in opposition to plaintiff's amended motion for class certification, defendants attacked the manageability of this case and the typicality of Mr. Acito as a representative. Seeking to duck these criticisms, plaintiff's counsel, in their reply brief filed less than ten days before oral argument, casually announced their willingness to lop off the last four months of the class period as defined in the amended complaint. This was substandard lawyering. If what plaintiff's counsel meant to do was to amend their complaint to alter the class period, they should have made a motion to do so.

Moreover, nowhere do plaintiff's counsel demonstrate that they procured Mr. Acito's consent to the purported amendment of the class period. Indeed, there is no evidence that Mr. Acito is even aware of the change. This is a glaring omission, since Mr. Acito purchased 1,000 of his 1,200 shares after October 1, 1991. By truncating the class period, therefore, plaintiff's counsel are not only turning their backs on untold numbers of plaintiffs who purchased shares after October 1, 1991, they are tossing out a substantial portion of their own named plaintiff's claim. Plaintiff's counsel owe a fiduciary duty to the class they represent. I cannot find they have adequately fulfilled that duty in light of their hasty and inadequate attempt to amend the class period.

Plaintiff's reply brief in support of the amended motion for class certification contained a statement which read, "Plaintiff's counsel recognize that the record before this Court **has been perfect.**" (Emphasis added). Subsequently plaintiff filed a supplement to the brief which corrected the statement to read "... the record before this Court **has not been perfect.**" (Emphasis added). This mistake and its correction, with poignant irony, speak for themselves. They make both case and point for this court's conclusion with more eloquence than any list of counsel's shortcomings this court could compile.

For all the foregoing reasons, the court concludes plaintiff's counsel have fallen short of the adequacy requirement under Rule 23(a)(4). Accordingly, I find that neither Mr. Acito nor his co-lead counsel will fairly and adequately represent the interests of the class.

## CONCLUSION

Plaintiff Acito has satisfied the numerosity requirement for class certification under Fed. R.Civ.P. 23(a)(1). He has also satisfied the commonality requirement under Rule 23(a)(2). However, plaintiff has failed to demonstrate that he meets the typicality requirement of Rule 23(a)(3). Moreover, he is not an adequate representative of the class as required by Rule 23 (a)(4), and even if he were, I am satisfied that his co-lead counsel would not fairly and adequately represent the class. The court therefore denies plaintiff's motion for class certification.

