**In re MILESTONE SCIENTIFIC SECURITIES LITIGATION.**

Civ.A. No. 98–3404(AJL).

United States District Court, D. New Jersey.

March 25, 1999.

Arthur N. Abbey, Jill S. Abrams, Joshua Lifshitz, Abbey, Gardy & Squitieri, LLP, New York City, for plaintiffs Robert M. Gintel, et al., and Vivian Bollag, et al.

Andrew N. Friedman, Mark S. Willis, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, D.C., for plaintiffs Dr. Alan Shaw and John Wanda.

Steven J. Toll, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Seattle, WA, for plaintiff John Wanda.

Allyn Z. Lite, Joseph J. DePalma, Goldstein Lite & DePalma, Newark, NJ, for plaintiffs John Wanda, Jeffrey Grau Ira,

Candice Zipes, Ram Yariv, Anne D. Shapiro, Nancy Canella, et al.

Peter S. Pearlman, Cohn Lifland Pearlman Herrman & Knopf LLP, Saddle Brook, NJ, for plaintiffs Laverne Catanzarite and Alexander Weingarten, et al.

Stephen D. Oestreich, Robert C. Finkel, Wolf Popper LLP, New York City, for plaintiff Laverne Catanzarite.

Richard D. Bemporad, David C. Harrison, Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, NY, for Laverne Catanzarite and Alexander Weingarten, et al.

Klari Neuwelt, Law Office of Klari Neuwelt, New York City, for plaintiffs Alexander Weingarten, et al.

James V. Bashian, Law Offices of James V. Bashian, P.C., Fairfield, NJ, for plaintiffs Vivian Bollag, et al.

Joel P. Laitman, Schoengold & Sporn, P.C., New York City, for plaintiffs Candice Zipes, et al.

Leonard Barrack, Daniel E. Bacine, Gerald Rodos, Barrack, Rodos & Bacine, Philadelphia, PA, for plaintiffs John Johnson, et al.

Samuel R. Simon, Robert A. Hoffman, Barrack, Rodos & Bacine, Haddonfield, NJ, for plaintiffs John Johnson, et al.

Jonathan M. Plasse, Emily C. Komlossy, Catherine A. Murphy, Goodkind Labaton Rudoff & Surachow, LLP, New York City, for plaintiffs Ram Yariv, et al.

Kenneth Elan, Joseph Garland, Law Offices of Kenneth Elan, New York City, for plaintiffs Ram Yariv, et al.

Peter L. Masnik, Kalikman & Masnik, Haddonfield, NJ, for plaintiffs John E. Houx, et al.

Sherrie Savett, Jacob A. Goldberg, Berger & Montague, P.C., Philadelphia, PA, for plaintiffs John E. Houx, et al.

Bruce Murphy, Vero Beach, FL, for plaintiffs John E. Houx, et al.

Neil Rothstein, David R. Scott, Scott & Scott, LLC, Philadelphia, PA, for plaintiffs John E. Houx, et al.

Burton H. Finkelstein, Donald J. Enright, Finkelstein, Thompson & Loughran, Washington, D.C., for plaintiffs Nancy Cannella, et al.

Marc I. Gross, Daniel R. Wotman, Pomerantz Haudek Block & Grossman, New York City, for plaintiffs Anne D. Shapiro, et al.

David Jaroslawicz, Jaroslawicz & Jaros, New York City, for plaintiffs Anne D. Shapiro, et al.

Miles M. Tepper, Law Offices of Miles M. Tepper, West Orange, NJ, for plaintiffs Joseph Shultz, et al.

Jeffrey H. Squire, Joanne M. Cicala, Kaufman, Malchman, Kirby & Squire, New York City, for plaintiffs Joseph Shultz, et al.

Gary S. Graifman, Kantrowitz, Goldhamer & Graifman, Chestnut Ridge, NY, for plaintiffs Neil Chernichaw, et al.

Jules Brody, Howard T. Longman, Aaron L. Brody, Tzivia Brody, Stull, Stull & Brody, New York City, for plaintiffs Neil Chernichaw, et al.

Steven M. Gellerstein, Gellerstein & Saul, Teaneck, NJ, for plaintiff Frank Nesbit, III.

Brian P. Murray, Rabin & Peckel LLP, New York City, for plaintiff Frank Nesbit, III.

Leo W. Desmond, Law Office of Leo W. Desmond, West Palm Beach, FL, for plaintiff Frank Nesbit, III.

Joseph P. LaSalla, McElroy, Deutsch & Mulvaney, Morristown, NJ, for plaintiffs Michael Trokel, et al.

Julie L. Friedberg, Berlack Israels & Liberman LLP, Morristown, NJ, for all defendants.

Martin S. Siegel, John P. Biederman, Berlack Israels & Liberman LLP, New York City, for all defendants.

Harvey J. Goldschmid, Eric Summergrad, Luis de la Torre, Securities and Exchange Commission, Washington, D.C., amicus curiae.

## OPINION

LECHNER, District Judge.

This is an action for securities fraud brought on behalf of shareholders of Milestone Scientific, Inc. ("Milestone"), seeking damages for violations of Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, 15 U.S.C. §§ 78t(a) and 78j(b), and Rule 10b–5 promulgated thereunder. 17 C.F.R. § 240.10b–5. Jurisdiction is alleged pursuant to 28 U.S.C. § 1331.

Plaintiffs Robert M. Gintel ("Robert Gintel"), Barbara Gintel, Gintel Partners Fund LP, Gintel Ray Ltd. Partnership, Gintel Asset Management Inc., Transaqua L.L.C. and the Gintel Fund (collectively, the "Gintel Group"), moved to be appointed lead plaintiff (the "Lead Plaintiff Motion") and for the approval of lead counsel (the "Lead Counsel Motion") (collectively, the "Motions").[1] In *In re Milestone Scientific Securities Litigation* ("*Milestone I*"), 183 F.R.D. 404 (D.N.J.1998), the Lead Plaintiff Motion was granted; the Gintel Group was appointed Lead Plaintiff.

Decision on the Lead Counsel Motion was reserved, however, pending re-briefing on the issue of the propriety of multiple lead counsel. The Gintel Group was directed to proffer sufficient justification, if any, for the approval of a "Plaintiffs' Executive Committee" and "Liaison Counsel" to represent the class of plaintiffs (the "Plaintiff Class").[2] The Securities and Exchange Commission (the "SEC") also was invited to submit a brief *amicus curiae* addressing the advantages and drawbacks of approving multiple lead counsel in a securities class action.

Additional submissions on the issue were received from three of the four firms originally retained by the Gintel Group and counsel for Milestone. An *amicus* brief from the SEC (the "SEC *Amicus* Brief") also was received.

Presently pending is the application of Abbey, Gardy seeking the appointment as sole lead counsel for the Plaintiff Class (the "Abbey, Gardy Lead Counsel Application"), pursuant to § 21D(a)(3) of the Exchange Act, as amended, 15 U.S.C. § 78u–4(a)(3).[3] For the reasons set forth below, the Abbey, Gardy Lead Counsel Application is granted.

*Background*

### A. Facts[4]

#### 1. The Wand

Milestone is a Delaware corporation with its principal place of business in New Jersey. *See* Complaint at ¶ 10. Milestone develops, manufactures, markets and sells equipment and related disposable or consumable items

---

1. The Motions were jointly filed by the Gintel Group and Dr. Alan Shaw ("Dr. Shaw"). The Lead Plaintiff Motion originally included Dr. Shaw as a proposed Lead Plaintiff. Dr. Shaw, however, filed a Notice of Withdrawal (the "Notice of Withdrawal") removing himself from consideration as lead plaintiff. *See* Notice of Withdrawal.

2. The Gintel Group originally retained three law firms, Abbey, Gardy & Squitieri, LLP ("Abbey, Gardy"), Cohen Milstein Hausfeld and Toll, P.L.L.C. ("Cohen Milstein"), and Schoengold & Sporn, P.C. ("Schoengold") to comprise the Plaintiffs' Executive Committee. The Gintel Group proposed Abbey, Gardy to act as chair (the "Chair") of the Plaintiffs' Executive Committee. A fourth law firm, Goldstein, Lite & DePalma, was selected by the Gintel Group to serve as Liaison Counsel. *See* Lead Counsel Motion.

3. The four law firms originally selected by the Gintel Group did not collectively submit a brief advocating the appointment of multiple lead counsel. Instead, Abbey, Gardy submitted a proposed order appointing itself as sole lead counsel (the "Revised Lead Counsel Order"). Schoengold and Cohen, Milstein jointly submitted a memorandum of law opposing the Abbey, Gardy Lead Counsel Application (the "Opposition Brief") and a proposed pre-trial order revising the organizational structure of the proposed Plaintiffs' Executive Committee and delineating the responsibilities of the proposed Chair (the "Proposed Pre–Trial Order No. 3").

 In a letter, (the "Milestone Letter") counsel for Milestone registered its opposition to the appointment of multiple lead counsel. By letter, (the "Schoengold Letter") Schoengold objected to the Milestone Letter and further urged the appointment of multiple lead counsel.

 Goldstein, Lite and DePalma declined to file a brief supporting its appointment as Liaison Counsel. *See* Letter from Goldstein, Lite & DePalma (the "Goldstein Lite & DePalma Letter").

4. The facts are derived from the class action complaint (the "Complaint") filed prior to consolidation on 19 June 1998, in *Bollag v. Osser et al.*, Civil Action No. 98–2854(AJL).

and products for use primarily by dental practitioners. *See id.* One of the principal products of Milestone is "The Wand", a computer-controlled device used to anaesthetize dental patients. *See id.* Milestone introduced The Wand at the American Dental Association (the "ADA") conference on 18 October 1997, and began selling units of The Wand in January 1998. *See id.*

## 2. *The Statements*

Optimistic statements concerning the test results and growth potential of The Wand were attributed to several of the officers and/or directors of Milestone. Before the launching of The Wand, the 1996 Annual Report of Milestone (the "1996 Annual Report") quoted Stanley F. Malamed ("Malamed"), soon-to-be special technology advisor to the president of Milestone, as follows:

> Our primary research and finding ... is that the vast majority of patients tested reported either a 'more comfortable,' or 'less painful' injection experience than any other local anesthetic injection method currently available. In the majority of test cases, the patient described The Wand as 'pain free.'

Complaint at ¶ 28 (quoting 1996 Annual Report). On 11 August 1997, Leonard A. Osser ("Osser"), Chief Executive Officer and Chairman of the Board of Directors of Milestone, stated in a report over the *Business Wire,* a national wire service, that "machine and disposable sales will grow rapidly after the introduction [of The Wand]." Complaint at ¶ 30.

Milestone similarly promoted The Wand in various publications and press releases. An article published in the *New York State Dental Journal* (the "NYSDJ") in August 1997 described a fifty patient clinical study which found a prototype of The Wand to be "two to three times less painful than the manual injection." Complaint at ¶ 31. The article in the NYSDJ was authored by Mark Hochman ("Hochman"), an assistant professor at the Stony Brook School of Dental Medicine of the University of New York and an associate clinical director of Milestone. *See id.* In October 1997, Hochman and Mark Friedman ("Friedman"), an associate professor at the University of Southern California ("USC")

School of Dentistry and clinical director of Milestone, co-authored an article in *The Compendium,* a journal published by the Dental Learning Systems Co. *See* Complaint at ¶ 35. The article in *The Compendium* similarly "prais[ed] The Wand." *See id.*

A press release issued by Milestone on or about 4 September 1997 announced USC would purchase The Wand (the "USC Purchase") for use by its dental students. *See* Complaint at ¶ 33. In another press release on 8 October 1997, Milestone reported it had authorized, and obtained commitments from full-service dental dealers Henry Shein Inc., Patterson Dental and American Dental Cooperative (collectively, "Dental Dealers"), to sell The Wand. *Id.* at ¶ 37.

In November 1995, Milestone common stock went public at $4.00 per share. Complaint at ¶ 5. Immediately upon the announcement of the USC Purchase on 4 September 1997, Milestone common stock rose to $9 ⅛ per share. *See id.* at ¶ 34. Subsequent to the announcement on 8 October 1997 that Dental Dealers were committed to selling The Wand, Milestone common stock rose to $25 per share on trading volume of more than 600,000 shares. *See id.* at ¶ 38. Milestone common stock traded as high as $27 ¾ per share in the fall of 1997. *Id.* at ¶ 5.

On 3 November 1997, in a report over the *Business Wire,* (the "3 November 1997 Announcement") Osser stated:

> We are very excited over the reaction of dentists at the ADA conference. It only serves to further our belief in how The Wand will advance the delivery of anesthesia in dentistry. We are very pleased with the amount of orders we have for The Wand so far and expect even more orders in the ensuing months.

Complaint at ¶ 40 (quoting 3 November 1997 Announcement). On 17 November 1997, Milestone announced over the *Business Wire* its financial results for the third quarter of 1997. The report indicated results for the three months ended 30 September 1997 were $670,896, as compared to $47,471 for the same period the previous year. *See* Com-

plaint at ¶ 42. Osser was reported as stating:

As the company that just recently launched The Wand (TM), a revolutionary new approach to giving 'painless' injections in dentistry, the results to date, understandably, do not reflect the tremendous excitement and acceptance that The Wand (TM) has received. We are gratified by the enthusiastic endorsement of The Wand (TM) as evidenced by the 8000 orders valued at $5 million that were booked as a result of the recent American Dental Association convention . . . . With ramp up of production under way and distribution arrangements in place with the leading distributors of dental equipment and supplies, we are looking forward to broad acceptance and usage of The Wand.

Complaint at ¶ 42. In a press release issued on 19 February 1998, (the "19 February 1998 Announcement") Milestone announced its intention to "increase manufacturing capacity by the third quarter to over 5 million disposables per month. The reaction from dentists using The Wand is overwhelmingly positive." Complaint at ¶ 44 (quoting 19 February 1998 Announcement).

Also in February 1998, Michael Krochak ("Krochak"), a director of the Dental Phobia Clinic at Mount Sinai Medical Center in New York City, authored an article published in the *Compendium.* The article stated, among other things, The Wand reduced patient anxiety. *See* Complaint at ¶ 45.

On 30 March 1998, in a report over the *Business Wire,* (the "30 March 1998 Announcement") Milestone stated:

The principal reason for . . . increase in losses [in the year ended December 31, 1997] were [sic] costs associated with research and development in connection with the completion of 'The Wand(TM)', marketing and personnel costs relating to the launch of 'The Wand(TM)' . . . . After reflecting these losses, Milestone's financial position continues to be strong with more than $15,000,000 in cash, cash equivalents and treasury bills at year-end and virtually no debt.

. . . . .

[F]or the 12 weeks ended March 26, 1998 indicating revenues of more than $5,000,-000 and profitable operations. Milestone has received orders for more than 12,000 units of 'The Wand(TM)' of which 7,011 have been shipped . . . . Reaction from dentists using 'The Wand(TM)' continues to be overwhelmingly favorable, returns from dealers, to date, have been limited and dealer inventories are low because of strong demand from dentists.

. . . . .

Osser . . . stated, 'The Wand's initial results and acceptance by the dental community has been extremely gratifying and in response to increasing demand for disposables the Company has accelerated steps to significantly increase its production capacity . . . . The continued excitement about The Wand gives us confidence that this revolutionary approach to painless dentistry will be an integral part of the dentist's practice.'

Complaint at ¶¶ 47–48 (quoting 30 March 1998 Announcement).

The 1997 Form 10–K of Milestone, issued on 31 March 1998, (the "1997 10–K of Milestone") additionally noted:

Three separate additional studies were conducted on various aspects of 'The Wand(TM)' operation. These have been published in major dental publications and have helped establish acceptance and credibility within the dental community.

. . . . .

During 1996 and 1997, the Company granted stock options to a director and various consultants to purchase 35,000 and 164,000 shares of common stock, respectively, at prices ranging from $5.125 per share to $6.50 per share.

Complaint at ¶¶ 49, 51 (quoting 1997 10–K of Milestone).

On 4 May 1998, Milestone reported over the *Business Wire,* (the "4 May 1998 Announcement") its results for the first quarter ended 31 March 1998:

Revenues for the three months ended March 31, 1998 were $5,260,149 compared to $760,123 for the same period a year ago.

The net income for the first quarter ending March 31, 1998 was $358,079, or $0.04 per share on weighted average shares outstanding of 8,733,373, compared to a loss of $(696,028), or $(0.14) per share on weighted average shares outstanding of 4,840,527 for the comparable period a year earlier. During the first quarter of 1998 the Company delivered 7,311 Wand(TM) system kits to distributors and 817,000 disposable components. This represents net sales of $4,760,069 for the first three months of the fiscal year.

The Company has a number of letters-of-intent from foreign distributors who are interested in bringing The Wand to the European, South American and Pacific Rim markets.

Complaint at ¶ 54 (quoting 4 May 1998 Announcement).

Following the 3 November 1997 Announcement, the price of Milestone common stock rose to $27 ⅛ per share on trading volume of more than 750,000 shares. *See* Complaint at ¶ 41. On 7 January 1998, Milestone announced its common stock had been accepted for trading on the NASDAQ. *See id.* at ¶ 43. On 23 April 1998, Milestone common stock began trading on the American Stock Exchange. *See id.* at ¶¶ 11, 53.

On 20 May 1998, it was first reported in the *Bloomberg News* that Milestone had awarded more than 100,000 stock options then worth $1 million to Hochman, Friedman and Krochak, all of whom published articles advocating use of The Wand. *See* Complaint at ¶ 55. The same article reported Malamed also received stock options. These financial interests of Hochman, Friedman, Krochak and Malamed were not previously disclosed to the public. The *Bloomberg News* also revealed that Melamed advised the USC dean, Howard Landesman, in the fall of 1997, to buy the devices. In addition, Osser was quoted as stating "if someone feels they've been misled, we'll make full disclosure." *See* Complaint at ¶¶ 57–58.

On 4 June 1998, Herriot Tabuteu ("Tabuteu"), an analyst at Nationsbank Montgomery Securities, reduced his estimate for sales of Milestone from $6.2 million to $4.2 million for the second quarter of 1998. Consequently, Tabuteu expected Milestone to report a modest loss for the second quarter of 1998, rather than the profit Tabuteu previously estimated. The revised calculations of Tabuteu incorporated the fact that Henry Shein Inc., the largest distributor of Milestone, reduced purchases of The Wand from 2,600 to 900 for the second quarter of 1998 (the "Shein Reduction"). *See* Complaint at ¶ 59.

On 5 June 1998, the *New York Post* reported Osser failed to reveal his association with "questionable companies and business associations," namely his prior affiliation with Geri–Care, a company that had been previously sued by the U.S. Government for Medicare fraud. *See* Complaint at ¶ 60.

On the same day, Milestone stated the Shein Reduction would result in a shortfall of approximately $1.2 million. Complaint at ¶ 60. Promptly after this announcement, the price of Milestone common stock plummeted approximately thirty-one percent to $10 ½ per share before trading was halted. On 5 June 1998, the price Milestone common stock fell an additional sixteen percent to $8 ¹³⁄₁₆ per share on trading volume of 1,168,300 shares. *See* Complaint at ¶ 61.

The Plaintiff Class alleges that during the class period (the "Class Period"),[5] Milestone and certain of its officers and/or directors failed to disclose the more than 100,000 stock options worth more than $1 million given to Hochman, Friedman and Krochak. *See* Complaint at ¶¶ 32, 46, 62. It is contended the failure to disclose this information and the receipt of the options rendered the judgment of Hochman, Friedman and Krochak "suspect." *See id.* at ¶¶ 32, 63. The Plaintiff Class attributes the sale of more than 7,000 of The Wands to the public to the reputations of Hochman, Friedman, Krochak and the publishers who advocated use of The Wand. *See id.* at ¶ 62. The Complaint alleges:

> Defendants were aware that on the strength of the articles and research of

---

5. For purposes of this opinion, the Class Period is deemed to run from 31 March 1997 to 5 June 1998.

these authors, dental schools, dentists and distributors would purchase large amounts of The 'Wand.' Defendants were equally aware that once it was disclosed that these same authors and researchers had received stock options from the Company these articles would be viewed as paid for promotional, and the orders and sales for The Wand would fall, as they did.

*Id.* at ¶ 63. In this regard, the Plaintiff Class alleges the "demand for The Wand was not as represented by the Company." *See id.* at ¶ 65.

It is additionally alleged certain of the officers and/or directors of Milestone "were privy to confidential and proprietary information concerning Milestone ... [and] knew or recklessly disregarded the fact that the adverse facts ... had not been disclosed to and were being concealed from the public." Complaint at ¶¶ 7, 19. Specifically, the Complaint alleges the officers and/or directors recklessly disregarded or actively concealed information indicating reactions from dentists to The Wand were not generally favorable. *See id.* at ¶¶ 7, 19, 64. It is alleged, without further explication, the dissatisfaction of the dentists stemmed in large part from the fact that "The Wand did not always achieve anesthesia." *See id.* at ¶ 64. The Plaintiff Class also asserts Malamed failed to disclose his receipt of options to acquire 50,-000 shares of Milestone common stock. *See id.* at 56.

Notice of the pendency (the "Notice of Pendency") of the class action was published over the *Business Wire* on 17 June 1998 by Cohen, Milstein on behalf of its client, John Wanda ("Wanda"). *See* Notice of Pendency. The Notice of Pendency provided, in relevant part:

> The complaint [filed by Wanda in the United States District Court for the District of New Jersey] asserts claims under the federal securities laws, including claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Plaintiff seeks to recover losses suffered by investors who bought Milestone Scientific common stock during the Class Period. The

lawsuit alleges that [Milestone] and certain of its officers and directors engaged in material misrepresentations and omissions during the class period concerning, among other things, that its new product was not meeting with widespread acceptance by dentists but rather that the purported acceptance had been achieved by improper means—the undisclosed payments of stock options worth more than $1 million to researchers to provide glowing testimonials regarding the Company's products.... If you are a member of the Class who purchased Milestone Scientific, Inc. common stock between September 29, 1997 and June 5, 1998 (the "Class Period"), you may move the Court, not later than sixty days from June 17, 1998, to serve as lead plaintiff for the Class.

*See* Notice of Pendency.

### 3. *The Gintel Group*

As indicated in *Milestone I,* it appeared the Gintel Group had the largest financial stake in the litigation, having collectively purchased during the Class Period more than 1,400,000 shares of Milestone common stock and suffered losses exceeding $11,700,000.

### B. *Procedural History*

The initial Complaint in the instant securities class action was filed by Wanda on 17 June 1998. *See* Notice of Pendency. On the same date, as previously discussed, the Notice of Pendency of the class action was published over the *Business Wire* by Cohen, Milstein, counsel for Wanda. *See id.*

Following the publication of the Notice of Pendency, other plaintiffs filed related securities class action complaints alleging similar facts. Sixteen complaints were filed against Milestone, and certain of its officers and/or directors, Osser, Daniel R. Martin, Michael McGeehan, Thomas M. Stuckey, Gregory Volok, Pat Mele III, Larry Haimovitch, Malamed, Hochman, Friedman and Krochak. By order, dated 17 August 1998, ("Pre–Trial Order No. 1") the actions were consolidated. *See* Pre–Trial Order No. 1.[6] These plaintiffs

---

6. The actions consolidated by Pre–Trial Order No. 1 were brought by John Wanda (98–2853), Laverne Catanzarite (98–2866), Vivian Bollag and Israel Bollag (98–2854), Alexander Weingar-

were represented by approximately twenty-seven law firms and individual practitioners.

The Gintel Group subsequently proposed the entry of a second pre-trial order (the "Proposed Pre–Trial Order No. 2"). Proposed Pre–Trial Order No. 2 outlined, *inter alia*, the organizational structure of the proposed lead counsel. *See id.* Specifically, it delineated the functions to be assigned to Abbey, Gardy, the Chair of the proposed Plaintiffs' Executive Committee:

The Chair shall, after consultation with the [Plaintiffs'] Executive Committee, *inter alia:*

1. coordinate plaintiffs' pretrial activities and plan for trial;

2. coordinate the briefing and arguments of motions;

3. coordinate the initiation and conduct of discovery proceedings;

4. negotiate with defense counsel with respect to settlement and other matters;

5. call meetings of plaintiffs' counsel with respect to settlement and other matters;

6. call meetings of plaintiffs' counsel when appropriate;

7. make all work assignments to plaintiffs' counsel to facilitate the orderly and efficient prosecution of this litigation and to avoid duplicative or unproductive effort;

8. coordinate and direct the preparation for a trial of this matter, and delegate work responsibilities to selected counsel as may be required;

9. consult with and employ experts;

10. maintain lists of all class action plaintiffs who have appeared in this action and their addresses and lists of all class action plaintiffs' counsel and their addresses;

11. coordinate and communicate with defendants' counsel with respect to matters addressed in this paragraph; and

12. perform such other duties and undertake such other responsibilities as they deem necessary or desirable.

Proposed Pre–Trial Order No. 2 at ¶ 1(D).

Proposed Pre–Trial Order No. 2 also set forth the functions of Goldstein, Lite & De-Palma, the proposed Liaison Counsel:

Plaintiffs' Liaison Counsel shall be responsible for communicating with the Court to coordinate the conduct of the litigation, including the receipt and dissemination of Court orders and notices.

. . . . .

No motion, request for discovery on other pretrial proceeding shall be initiated or filed by any plaintiff except through the Chair and signed by Liaison Counsel after consultation with the Executive Committee.

*Id.* at ¶¶ 1(C), 1(E). Proposed Pre–Trial Order No. 2 did not specifically state the functions of the proposed Plaintiffs' Executive Committee. It simply provided:

The Chair ... *after consultation with the [Plaintiffs'] Executive Committee,* shall be responsible for coordinating and organizing plaintiffs in the conduct of this litigation, shall be the spokesperson for plaintiffs' counsel ... and shall attend all court hearings and be the contact person for all plaintiffs' counsel.

*Id.* at ¶ 1(C) (emphasis added).

*Milestone I* reserved decision on the Lead Counsel Motion pending re-briefing of the issue of the suitability of multiple lead counsel. *See* 183 F.R.D. at 419. Abbey, Gardy then submitted the Revised Lead Counsel Order, requesting the appointment of Abbey, Gardy as sole lead counsel. The Revised Lead Counsel Order modifies the suggested functions of Abbey, Gardy as follows:

Abbey, Gardy & Squitieri, LLP shall have authority to speak for plaintiffs' counsel in matters regarding pretrial and trial procedures and settlement negotiations, and shall make all work assignments to non-Lead Counsel in such manner as to facili-

ten and Sidney Weingarten (98–2876), Jeffrey Grau Ira (98–2885), Candice Zipes (98–2973), John Johnson (98–2956), John E. Houx (98–3081), Ram Yariv (98–3403), Ann D. Shapiro

(98–3404), Joseph Shultz (98–3256), Nancy Cannella (98–3118), Neil Chernichaw (98–3280), Michael Trokel, Frank Nesbit III, and Julius Rivera and Rosa Rivera (98–3780).

tate the orderly and efficient prosecution of this litigation and to avoid duplicative or unproductive effort.

Abbey, Gardy & Squitieri, LLP shall be responsible for coordinating all activities and appearances on behalf of Lead Plaintiff and for the dissemination of notices and orders of this Court. No motion, request for discovery or other pretrial proceeding shall be initiated or filed by Lead Plaintiff except through Abbey, Gardy & Squitieri, LLP.

Abbey, Gardy & Squitieri, LLP shall be available and responsible for communications to and from this Court on behalf of Lead Plaintiff.

Defendants' counsel may rely upon all agreements made with Abbey, Gardy & Squitieri, LLP or other duty authorized representatives of Lead Plaintiff, and such agreements shall be binding on Lead Plaintiff.

Revised Lead Counsel Order at ¶¶ 3–6.

Schoengold and Cohen, Milstein, who, along with Abbey, Gardy were originally suggested by the Gintel Group to comprise the Plaintiffs' Executive Committee, submitted the Opposition Brief and Proposed Pre–Trial Order No. 3. Proposed Pre–Trial Order No. 3 provides, in relevant part:

The Court ... selects a plaintiffs' Executive Committee composed of the law firms of Abbey, Gardy & Squitieri, LLP as Chair ..., Cohen, Milstein, Hausfeld & Toll, P.L.L.C. and Schoengold & Sporn, P.C. as members of the plaintiffs' Executive Committee.

The Chair or its designee(s), after consultation with the Executive Committee, shall be responsible for coordinating and organizing plaintiffs in the conduct of this litigation, shall be the spokesperson for plaintiffs' counsel at, *inter alia*, pre-trial conferences, and shall attend all court hearings and be the contact person for all plaintiffs' counsel.

. . . . .

No motion, request for discovery or other pre-trial proceeding shall be initiated or filed by any plaintiff except through the Chair, after consultation with the Executive Committee so as to prevent duplicative or overlapping pleadings or discovery requests.

Proposed Pre–Trial Order No. 3 at ¶¶ B, C, E. Proposed Pre–Trial Order No. 3 also designates distinct duties for the proposed Chair, Abbey, Gardy. *Id.* at ¶ D. The enumerated duties of the proposed Chair are identical to those listed in the Proposed Pre–Trial Order No. 2.

*Discussion*

A. *The Private Securities Litigation Reform Act of 1995*

Private securities actions under the Federal securities laws provide " 'a most effective weapon in the enforcement' of the securities laws and are a 'necessary supplement to [SEC] action.' " *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 310, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985) (quoting *J.I. Case Co. v. Borak,* 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964)). Congress, in enacting the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4 (the "PSLRA"), recognized: "Private securities litigation is an indispensable tool with which defrauded investors can recover their losses." Joint Explanatory Statement of the Committee of Conference, Conference Report on Securities Litigation Reform, H.R.Rep. No. 369, 104th Congress, 1st Sess. at 31, *reprinted in* 1995 U.S.C.C.A.N. 679 (the "Conference Report").

 Congress enacted the PSLRA to remedy perceived abuses in private securities class action litigation. *See Milestone I,* 183 F.R.D. at 411; *In re Cendant Corp. Litig.,* 182 F.R.D. 144 (D.N.J.1998); *In re Oxford Health Plans, Inc., Sec. Litig.,* 182 F.R.D. 42, 43 (S.D.N.Y.1998); *Chill v. Green Tree Financial Corp.,* 181 F.R.D. 398, 404–05 (D.Minn.1998); *Gluck v. Cellstar Corp.,* 976 F.Supp. 542, 543–44 (N.D.Tex.1997); *Lax v. First Merchants Acceptance Corp.,* 1997 WL 461036, at *2 (N.D.Ill. 11 Aug. 1997).

 One objective of the PSLRA was to ensure more effective representation of the interests of investors in private securities class actions. Before the enactment of the PSLRA, private class actions for securities

fraud were subject to manipulation by lawyers and "professional plaintiffs," whose financial holdings in the defendant issuers were insignificant. *See* Conference Report at 730–34. Often controlling the securities class actions, these plaintiffs and lawyers reaped significant profits, to the detriment of shareholders with more substantial financial holdings. *See id.; see also Milestone I,* 183 F.R.D. at 411; *Cendant,* 182 F.R.D. at 145; *D'Hondt v. Digi Int'l Inc.,* 1997 WL 405668, at *2 (D.Minn. Apr. 3, 1997); *Ravens v. Iftikar,* 174 F.R.D. 651, 654 (N.D.Cal.1997). The PSLRA initiated the transfer of "primary control of private securities litigation from lawyers to investors." Conference Report at 683, 685; *see also Milestone I,* 183 F.R.D. at 411–12; *Chill,* 181 F.R.D. at 407; *Gluck,* 976 F.Supp. at 546.

The PSLRA added § 21D ("Section 21D") to the Exchange Act, as amended, 15 U.S.C. § 78u–4. Section 21D sets forth, *inter alia,* the procedures for the retention of lead counsel. Pursuant to Section 21D(a)(3)(B)(v), "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u–4(a)(3)(B)(v).[7]

## B. *Appointment of Lead Counsel*

The approval of lead counsel pursuant to Section 21D(a)(3)(B)(v) is not governed by the same statutory guidelines which control the lead plaintiff determination. *See Cendant,* 182 F.R.D. at 149 (stating lead plaintiff does not come "inextricably tied to its counsel"). The decision to approve counsel selected by the lead plaintiff is a matter within the discretion of the district court. *See id.* The legislative history of the PSLRA reveals that Congress wished to encourage the exercise of discretion in approving the selection of lead counsel.

The selection of the most adequate plaintiff under the PSLRA is governed by a rebuttable presumption:

> [T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that—
> (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
> (cc) otherwise satisfies the requirement of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). This presumption of adequacy

> may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—
> (aa) will not fairly and adequately protect the interest of the class; or
> (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(II). As discussed in *Milestone I,* it appeared the Gintel Group was presumptively the most adequate plaintiff, having purchased 1,412,200 shares of Milestone common stock and having suffered losses of $11,789,419.94. It also appeared the Gintel Group preliminarily met the "adequacy" and "typicality" requirements of Fed.R.Civ.P. 23(a). The adequacy of the Gintel Group was not rebutted. It appeared, moreover, fourteen of the sixteen class action plaintiffs supported the Lead Plaintiff Motion. *See Milestone I,* 183 F.R.D. at 417.

---

**7.** As discussed in *Milestone I* in connection with the Lead Plaintiff Motion, the PSLRA also altered the procedure by which the lead plaintiff for the purported class is appointed. Pursuant to the PSLRA, the plaintiff who is "first to file" is no longer assured of the lead plaintiff position. Section 21D(a)(3)(B)(i) provides:

> [T]he court shall consider any motion made by a purported class member in response to the notice [of the class action], including any motion by a class member who is not individually named as a plaintiff in the complaint or complaints, and shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class members. . . .

15 U.S.C. § 78u–4(a)(3)(B)(i). In a consolidated action such as this,

> the court shall not make the determination required by clause (i) until after the decision on the motion to consolidate is rendered. As soon as practicable after such decision is rendered, the court shall appoint the most adequate plaintiff as lead plaintiff for the consolidated actions in accordance with this paragraph.

15 U.S.C. § 78u–4(a)(3)(B)(ii).

In eschewing the "first come, first serve" determination of the lead plaintiff in favor of the most adequate plaintiff, the PSLRA " 'ensure[s] that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers.' " *See Milestone I,* 183 F.R.D. at 412 (quoting *In re Donnkenny Inc. Sec. Litig.,* 171 F.R.D. 156, 157 (S.D.N.Y.1997) (citing Conference Report at 730–34)).

[Congress] does not intend to disturb the court's discretion under existing law to approve or disapprove the lead plaintiff's choice of counsel when necessary to protect the interests of the plaintiff class. Conference Report at 685. The exercise of such discretion necessitates an inquiry into the appropriateness of the appointment of several lead counsel; the nature and extent of such inquiry may vary from case to case.

■ The judgment of a lead plaintiff or proposed lead counsel is not dispositive in the appointment of lead counsel. Approval of lead counsel necessarily requires an independent evaluation of, among other considerations, the effectiveness of proposed class counsel to ensure the protection of the class. As well, a court must be mindful that the lead plaintiff has significant responsibilities and duties, including the management of the direction of the case. Disputes concerning the direction of the case should be resolved by the lead plaintiff. This task can be complicated, or even thwarted, by pressure or impute from several lead counsel.

■ The PSLRA does not expressly prohibit the lead plaintiff from selecting more than one law firm to represent the class. *See* 15 U.S.C. § 78u–4(a)(3); *see also Oxford,* 182 F.R.D. at 50; *Zuckerman v. Foxmeyer Health Corp.,* 1997 WL 314422, at *2 (N.D.Tex. 28 Mar. 1997). In certain situations, the appointment of multiple lead counsel may better protect the interests of the plaintiff class. Where a single firm lacks the resources or expertise to prosecute an action, for example, the approval of multiple lead counsel may expedite litigation. *See Oxford,* 182 F.R.D. at 49 (where proposed law firms were small and litigation was potentially "costly and time-consuming," the "sharing of resources and experience" would ensure a more expeditious resolution of the action); *In re Wells Fargo Sec. Litig.,* 156 F.R.D. 223, 226 (N.D.Cal.1994) ("[The] plaintiff law firms, which usually take cases on a contingent fee basis, join together to prosecute major complex cases because doing so allows them to leverage their resources and spread the risks of unfavorable outcomes."); *see also* SEC *Amicus* Brief at 9 & n. 4. However, as discussed below, the appointment of several

firms as lead counsel can raise a number of concerns, including the hindrance of the ability of lead plaintiff to manage the case and supervise counsel, duplication of efforts, absence of coordination, delay and increased fees and costs.

As the SEC observes, the approval of multiple lead counsel may engender inefficiency in class action litigation. *See* SEC *Amicus* Brief at 11–13. The potential for duplicative services and the concomitant increase in attorneys' fees works against the approval of multiple lead counsel. *See Chill,* 181 F.R.D. at 413 (the structure of proposed leadership should not be "too distended to efficiently manage the prosecution of th[e] action"); *Reiger v. Altris Software, Inc.,* 1998 U.S. Dist. LEXIS 14705, at *15–16, *18 (S.D.Cal. 11 Sept. 1998) (observing the enlargement of the number of lead counsel may "unnecessarily increase the time and expense spent on preparing and litigating the case"); *Ballan v. Upjohn Co.,* 159 F.R.D. 473, 491 (W.D.Mich. 1994) (quoting Manual for Complex Litigation 2nd § 20.22 at 16)(stating " 'the number [of lead counsel] should not be so large as to hamper the unity of direction that is needed' ").

In this connection, the "litigation by committee" approach to securities class actions may prove unnecessary and wasteful.

> Because the appointment of committees of counsel can lead to substantially increased costs, they should not be made unless needed; a need is most likely to exist in cases in which the interests and positions of group members are sufficiently dissimilar to justify giving them representation in decision making. . . . Great care must be taken, however, to avoid unnecessary duplication of efforts and to control fees and expenses.

Manual for Complex Litigation 3rd § 20.221 at 27–28.

The limitation in the PSLRA of total attorneys' fees to "a reasonable percentage of the amount of damages and prejudgment interest actually paid to the class," *see* 15 U.S.C. § 78u–4(a)(6), does nothing to increase, much less regulate, the efficiency of multiple counsel. This provision neither guarantees the

reasonableness of fees nor the non-duplication of services. As the SEC argues: "No rule's dictate can completely overcome the inefficiency, added cost, and delay inherent in an inappropriate multiple counsel arrangement." SEC *Amicus* Brief at 15.

It appears, moreover, "a court's expertise is rarely at its most formidable in the evaluation of counsel fees." *Cendant,* 182 F.R.D. at 150; *see also Raftery v. Mercury Finance Co.,* No. 97–624, 1997 WL 529553, at *2 (N.D.Ill. 15 Aug. 1997) ("[T]hat the court will be able to divine the reasonable value of the services rendered [by attorneys] when the time comes [is] a false proposition."); SEC *Amicus* Brief at 15 (acknowledging the difficulty courts face in reviewing attorneys' fee awards); *but see Oxford,* 182 F.R.D. at 50 (appointment of co-lead counsel contingent on the non-duplication of attorneys' fees); *Lax,* 1997 WL 461036, at * 7 (appointing two law firms as co-lead counsel "provided that there is no duplication of attorneys' services, and the use of co-lead counsel does not in any way increase attorneys' fees and expenses"); *Nager v. Websecure, Inc.,* 1997 WL 773717, at *1 (D.Mass. 26 Nov. 1997).

It is impossible, during the preliminary stages of litigation, to evaluate the potential of, much more guarantee, the non-duplication of services or the reasonableness of attorneys' fees during the course of the prosecution of the action. It is, however, possible at the outset of the litigation, to structure lead counsel so as to avoid the inevitable inefficiency and expense resulting from an inappropriate multiple lead counsel arrangement.

■ Additionally, where several lead counsel are appointed, there is the potential they may ultimately seize control of the litigation, an occurrence the PSLRA intended to foreclose. As discussed, the PSLRA was designed, in part, to effectuate the transfer of control of securities class actions from the lawyers to the investors. *See* Conference Report at 685. Accordingly, those seeking the appointment of several lead counsel must demonstrate the lead plaintiff will be able to withstand any limitation on, or usurpation of, control, and effectively supervise the several law firms acting as lead counsel.

For example, in *Ballan,* 159 F.R.D. 473, a case pre-dating the enactment of the PSLRA, the district court expressed skepticism regarding the ability of named plaintiffs to control multiple law firms and maintain unity of direction. In evaluating the adequacy of the proposed named plaintiff in representing the class, the court stated:

[I]t would be naive not to understand that many of these class actions are lawyer-driven. Nevertheless, the participation of named plaintiffs must not be 'so minimal that they virtually have abdicated to their attorneys the conduct of the case.'

*Id.* at 486 (quoting *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 728 (11th Cir.), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1221, 99 L.Ed.2d 421 (1988)). The court concluded the three proposed co-lead counsel and proposed named plaintiff had not "satisf[ied] the court that the [named] plaintiff was willing and able to supervise so many firms." *Id.* at 491. The court reasoned: "There is no evidence before the court that [the named plaintiff] ... considered the potential cost to the class arising from the participation of so many firms." *Id.* at 486; *see In re Frontier Group Inc. Sec. Litig.,* 172 F.R.D. 31, 47 (E.D.N.Y.1997) (stating "plaintiffs have an obligation to oversee the conduct of their attorneys and to guard against any overreaching or other conduct"); *Welling v. Alexy,* 155 F.R.D. 654, 659 (N.D.Cal.1994) (named plaintiff deemed inadequate in part due to lack of interest in supervising attorneys); *see also* SEC *Amicus* Brief at 11 (citing and discussing *Ballan* ). Before lead counsel can be approved under the PSLRA, a lead plaintiff must prove capable of directing the litigation and handling law firms with potentially disparate and competing interests.

■ The selection of counsel by a lead plaintiff also must be the product of independent, arms length negotiations. This Circuit has observed: "[T]he lead attorney position is coveted as it is likely to bring its occupant the largest share of the fees generated by the litigation." *Garr v. U.S. Healthcare, Inc.,* 22 F.3d 1274, 1277 (3d Cir.1994). Consequently, there arises the possibility that several law firms may exert pressure on the

lead plaintiff. In *Raftery*, the court expressed concern about a retainer agreement between the proposed lead plaintiff and a law firm where there appeared the possibility of an early settlement. 1997 WL 529553, at *2. The court suspected the cap of thirty-three and one-third percent on the retainer agreement was "not the result of hard bargaining." *Id.* It was observed that a reasonable fee is the lowest fee "that would be paid by a discerning client in an arms length negotiation." *Id.*

Not only should the proposed counsel fees be the result of hard-bargaining, but the initial selection of counsel should also be the result of independent decision-making by the lead plaintiff. The SEC argues that "unless there has been active, effective client participation in the [selection] process, it is possible that the counsel arrangement may simply reflect bargaining among lawyers for their own stake in the case, and not serve the best interests of the class." SEC *Amicus* Brief at 21–22. It appears this may be the situation in the instant case.

The potential for interference with the independent judgment of a lead plaintiff may be amplified when several law firms are vying for the appointment of lead counsel. Where the proposed organizational structure for lead counsel markedly increases the likelihood of interference with the decision-making process of the lead plaintiff, the selection of counsel by the lead plaintiff should not automatically be accorded deference. Simply stated: class actions are not to be used as a vehicle to promote attorney employment.

As the SEC also recognizes, the approval of several lead counsel may precipitate friction and a lack of coordination among counsel. *See* SEC *Amicus* Brief at 12–13; *see also Ballan*, 159 F.R.D. at 491 (observing "[e]ach of the firms designated as 'co-lead' counsel was quick to point the finger at someone else [concerning a mistake], and none assumed ultimate accountability"). Conflicts among counsel may translate into innumerable disputes over the direction of the litigation.

■ Applying these principles to the instant case, it appears the appointment of several lead counsel will not promote the efficient prosecution of this case, and is not warranted. As observed in *Milestone I*, the functions of the proposed Plaintiffs' Executive Committee and Liaison Counsel appeared to be ministerial in nature and co-extensive with the responsibilities of the proposed Chair. *See* Proposed Pre–Trial Order 2. Schoengold and Cohen, Milstein, two of the law firms initially proposed as members of the Plaintiffs' Executive Committee, have not assuaged these concerns or demonstrated sufficient need justifying the approval of a three-member Plaintiffs' Executive Committee.[8] The simple assurance that there is a benefit to be derived from the impute of several law firms is not sufficient justification.

In challenging the Abbey, Gardy Revised Lead Counsel Order, Schoengold and Cohen, Milstein argued, *inter alia,* the Plaintiffs' Executive Committee will not foster duplication of attorney services. They attempted to isolate three issues they suggest predominate the instant litigation,[9] proposing these issues be divided among the three-member Plaintiffs' Executive Committee: "Each firm on

---

8. Schoengold and Cohen, Milstein withdrew the request for the appointment of Liaison Counsel, as originally proposed in the Proposed Pre–Trial Order No. 2. *See* Opposition Brief at 4 n. 3. Schoengold and Cohen, Milstein instead submitted Proposed Pre–Trial Order No. 3 in support of the appointment of a three-member Plaintiffs' Executive Committee to serve as co-lead counsel, excluding Goldstein, Lite & DePalma. *See* Proposed Pre–Trial Order No. 3. As mentioned, Goldstein, Lite and DePalma declined to file a brief supporting its appointment as Liaison Counsel. *See* Goldstein, Lite & DePalma Letter.

9. Schoengold and Cohen, Milstein defined the issues involved in the litigation as follows:

(1) Milestone's marketing of The Wand through conferences and via published articles authored by individuals who had undisclosed financial interests in Milestone, and thereby had a motive to promote The Wand;

(2) The number of Wands actually ordered by potential end-users and Milestone's alleged practice of encouraging its distributors to inflate their orders of The Wand; and

(3) The efficacy of The Wand at delivering an adequate dose of anesthesia to dental patients.

*Opposition Brief at 5–6.*

the committee would be responsible for its issue throughout the course of the litigation, and would thereby develop expertise on that issue." Opposition Brief at 6.

It appears, however, the issues described by Schoengold and Cohen, Milstein are general in nature and overlap to a significant degree. The three issues all concern alleged misrepresentations made by representatives of Milestone in conjunction with the marketing and sale of The Wand, and the resulting consequences. As such, these issues will likely permeate the litigation, and may not be so easily isolated and divided. Even if each member of the proposed Plaintiffs' Executive Committee is able to focus on one issue, this suggestion nevertheless does not protect against, much more ensure, the non-duplication of efforts. Rather, it appears this proposal will increase costs and decrease efficiency. Obviously, effective representation of a class and the daily responsibilities of counsel extend beyond the duties implicated by the three issues. As explained below, however, Schoengold and Cohen, Milstein did not address or propose the division of any essential responsibilities of the Plaintiffs' Executive Committee.

In this regard, Proposed Pre–Trial Order No. 3 does not remedy the deficiencies of Proposed Pre–Trial No. 2. Proposed Pre–Trial No. 3 simply provides:

> The Chair or its designee(s), *after consultation with the Executive Committee*, shall be responsible for coordinating and organizing plaintiffs in the conduct of this litigation, shall be the spokesperson for plaintiffs' counsel at, *inter alia* pre-trial conferences, and shall attend all court hearings and be the contact person for all plaintiffs' counsel.
>
> \* \* \* \* \* \*
>
> No motion, request for discovery or other pre-trial proceeding shall be initiated or filed by any plaintiff except through the Chair, *after consultation with the Executive Committee* so as to prevent duplicative or overlapping pleadings or discovery requests.

Proposed Pre–Trial Order No. 3 at ¶¶ C, E (emphasis added).

Proposed Pre–Trial Order No. 3 does not delineate any specific responsibilities of the Plaintiffs' Executive Committee. It appears the sole function of the proposed Executive Committee is to act as consultant to the Chair. The Chair, on the other hand, is given numerous responsibilities, including the coordination of pre-trial activities, motions and discovery proceedings, the organization of meetings and negotiations with defense counsel. *See id.* at ¶ D. Proposed Pre–Trial Order No. 3 also does not reflect the division of the three issues proposed in the Opposition Brief. *See id.* Schoengold and Cohen, Milstein have not demonstrated how the proposed Plaintiffs' Executive Committee will avoid unnecessary duplication of efforts and discourage inefficiency.

Schoengold and Cohen, Milstein also have not demonstrated how the proposed Plaintiffs' Executive Committee will contain attorneys' fees and expenses. They feebly argued, "if, after reviewing [quarterly reports detailing billed time and expenses to be submitted by lead counsel], the Court is not satisfied that the Executive Committee is operating in an efficient manner, the Court may take whatever action it deems appropriate to protect the Class." Opposition Brief at 5. This argument does not take into account the difficulty inherent in post-hoc review of attorneys' fee awards. As discussed, organization of counsel may be arranged at the outset of the litigation to avoid inefficiency and deter unreasonable attorneys' fees.

Schoengold and Cohen, Milstein also have not addressed the danger the proposed Plaintiffs' Executive Committee may usurp control of the litigation. Schoengold and Cohen, Milstein failed to demonstrate the lead plaintiff would be able to effectively supervise and control the direction of the litigation if the firms comprising the proposed Plaintiffs' Executive Committee were appointed co-lead counsel. It is not discernible from the submissions of Schoengold and Cohen, Milstein whether the lead plaintiff is capable of guarding against the non-duplication of attorney services or engaging in arms length bargaining for reasonable counsel fees. *See Ballan,* 159 F.R.D. 473; *Raftery,* 1997 WL

529553, at *2. This, as explained, is not the only reason to reject litigation by committee in this case.

It further appears the objectives of the law firms proposed as the Plaintiffs' Executive Committee already conflict. As indicated, Abbey, Gardy submitted a Revised Lead Counsel Order proposing itself as sole lead counsel. Schoengold and Cohen, Milstein, by contrast, opposed the Abbey, Gardy Lead Counsel Application and the proposed Revised Lead Counsel Order. Schoengold and Cohen, Milstein instead submitted Proposed Pre–Trial Order No. 3 advocating the appointment of a three firm Plaintiffs' Executive Committee. Such conflicts have the potential to undermine future coordination among counsel.

Future conflicts during the course of the litigation also are likely to arise between Abbey, Gardy and Schoengold and Cohen, Milstein. Abbey, Gardy, as proposed Chair of the Plaintiffs' Executive Committee, would be forced to negotiate with Schoengold and Cohen, Milstein concerning their duties and constantly debate the proper course of litigation. In point of fact, the adoption of Proposed Pre–Trial Order No. 3 would require Abbey, Gardy to consult with the proposed Plaintiffs' Executive Committee before initiating a motion or speaking on behalf of counsel. *See* Proposed Pre–Trial Order No. 3 at ¶¶ C, E. The appointment of the proposed Plaintiffs' Executive Committee in the instant action is a virtual invitation for infighting. The potential duplication of attorney services notwithstanding, the existing and future conflicts between Abbey, Gardy and Schoengold and Cohen, Milstein caution against the litigation by committee approach in this case.

Other policy considerations also weigh in favor of appointing a single law firm as lead counsel in this case. In support of the approval of the proposed Plaintiffs' Executive Committee, Schoengold and Cohen, Milstein argued:

> Certainly, the 16 law firms who chose not to file motions for lead plaintiff and lead counsel in this action did so with the assumption that the executive committee structure would be in effect. . . . If such

consensual motions are not recognized by the courts, it may engender competing motions for lead plaintiff, causing a significant delay in the progress of the litigation and further congestion in court dockets.

Opposition Brief at 8. This so-called "policy" argument, or threat, ignores the rationale behind the lead plaintiff provisions of the PSLRA. As discussed in *Milestone I,* the PSLRA was implemented to replace the outdated practice of selecting representative plaintiffs by a "race to the courthouse," with a selection system which focuses on the adequacy of the representative. *See* Conference Report at 689; *see also Milestone I,* 183 F.R.D. at 412; *Cendant,* 182 F.R.D. at 144–45; *Ravens,* 174 F.R.D. at 654. Indeed, the selection system embodied in the PSLRA provisions is governed by a presumption which is rebuttable. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II). Contrary to the argument of Schoengold and Cohen, Milstein, the identification of the most adequate plaintiff may necessitate, and the PSLRA provisions encourage, competing motions for lead plaintiff and counsel. Accordingly, granting the consensual motion of the lead plaintiff for co-lead counsel simply to deter competing motions in the future would be antithetical to the express policies of the PSLRA.

█ Abbey, Gardy appears able to singly undertake the responsibilities of lead counsel in this action. *See* Revised Lead Counsel Order (revising the proposed duties and functions of Abbey, Gardy to fit the role of sole lead counsel). Schoengold and Cohen, Milstein, by contrast, rigidly advocate an inefficient litigation by committee approach, similar to that originally proposed by the lead plaintiff. *Compare* Pre–Trial Order No. 3 *with* Pre–Trial Order No. 2. Neither Schoengold nor Cohen, Milstein has demonstrated a willingness to individually assume all of the responsibilities associated with the sole lead counsel position. Consequently, in this case it appears Abbey, Gardy is a more suitable lead counsel selection.

It further appears Abbey, Gardy has sufficient resources and flexibility to effectively manage the litigation for the entire Plaintiff Class. A review of the firm resume of Abbey, Gardy reveals it to be qualified in the

general area of Federal securities laws. It appears Abbey, Gardy has been lead or co-lead counsel in more than thirty securities class actions. The firm resume illustrates Abbey, Gardy has successfully prosecuted numerous securities fraud class actions on behalf of investors, resulting in recoveries in excess of $1 billion. From a review of the nature, scope and likely demands of this case, it appears Abbey, Gardy is capable of handling all aspects of the litigation.[10]

While appointment of several firms as lead counsel may at times promote effective management of a class action, this is not such a case. Schoengold and Cohen, Milstein have not demonstrated how the possible benefits derived from appointing several lead counsel outweigh the complications and increased costs and expenses associated with the litigation by committee approach.[11] Accordingly, there is no reason to burden the Plaintiff Class with additional counsel fees, delay or confusion which would result from the appointment of multiple counsel. Abbey, Gardy is approved as sole lead counsel for the Plaintiff Class. As noted, this decision does not prohibit Abbey, Gardy from farming out work to other firms because of expertise, proximity to witnesses or evidence or to promote efficiency or expedition.

### Conclusion

For the foregoing reasons, the Abbey, Gardy Lead Counsel Application is granted.

---

**10.** Abbey, Gardy may, in its capacity as lead counsel, distribute non-duplicative work assignments to non-lead counsel so as to facilitate the orderly and efficient prosecution of the action. *See In re Wells Fargo Sec. Litig.*, 156 F.R.D. at 227 (appointing a single lead counsel but stating the firm may "farm[ ] out work on the case to another law firm because of specialized knowledge, geographic proximity to witnesses or evidence or other comparative advantages, or even to spread risk"); *Malin v. Ivax Corp.*, No. 96–1843, Order at 8 (S.D.Fla. 1 Nov. 1996) (urging the utilization of other firms retained in the action by other plaintiffs); *see also* SEC *Amicus* Brief at 17.

Abbey, Gardy also must select local counsel, pursuant to the Local Civil Rules. *See* L.Civ.R. 101.1(c).

**11.** The views of defense counsel concerning the appropriateness of multiple lead counsel are, at this preliminary stage of the litigation, not relevant. As stated in *Milestone I*, defendants do not have standing to object to the appointment of lead plaintiff. *See* 183 F.R.D. at 415 n. 14; *Gluck*, 976 F.Supp. at 550, *Zuckerman*, 1997 WL 314422, at *2; *Greebel*, 939 F.Supp. at 6.0–61; *Fischler v. AmSouth Bancorp.*, 1997 WL 118429, at *2 (M.D.Fla. 6 Feb. 1997); *but see King v. Livent, Inc.*, 36 F.Supp.2d 187, 189–90 (S.D.N.Y. 17 Feb. 1999). As discussed, the lead plaintiff, not the defendants, may select counsel to represent the class, subject to the approval of the court. *See* 15 U.S.C. § 78u–4(a)(3)(B)(v). Counsel for Milestone may not be heard on this issue.